In the Matter of Disbarment of LESLIE J. LYONS.

Kansas City Court of Appeals, April 1, 1912.

1. **DISBARMENT: Attorney at Law: Character.** Too much is staked upon the honesty and good conduct of lawyers for courts to wink at flagrant misconduct. They are trusted by the community with the care of their lives, liberty and property, with no other security than personal honor and integrity.

2. **PROSECUTING ATTORNEYS: United States District Attorneys: Partners: Statute.** The statute of Missouri (Sec. 1039, R. S. 1909) forbidding partners of prosecuting attorneys from defending in criminal cases, does not apply to United States district attorneys practicing in the Federal court.

3. ————: ————: ————: ————. Aside from a statute, it would be unprofessional conduct, justifying disbarment, for a United States district attorney to have a partner defending criminal cases in the Federal court.

4. ————: **Partner: Civil Business: Criminal Cases.** The law of Missouri does not forbid a person holding the office of prosecuting attorney, from having a partner in civil business. But it would be unlawful for such partner to defend criminal cases.

5. **GRAND JURY: Accused: Right to Appear Before.** One under investigation by a Federal grand jury for a criminal offense, has no right to demand that the United States district attorney permit him to go before such jury for the purpose of explaining the charges; and it is not misconduct in the attorney if he fails to invite him before the jury.

6. ————: ————: ————: **Private Papers: Evidence: Order of Court.** Where papers belonging to one accused of using the mails for fraudulent purposes, are turned over to a post-office inspector by the accused party, with the promise that he will return them, and he places them in the hands of the United States district attorney; it was *held* not unlawful or improper for the latter to obtain an order from the Federal court placing the papers in the custody of the clerk of the court for use of either party at the trial.

7. ————: ————: ————: ————: ————: ————. A number of charges against a United States district attorney, of alleged misconduct, with a view to his disbarment from practice in the state courts, are separately examined and each found to be wholly unsupported by evidence.

8. ———: **Zeal: Duty: Persecution: Disbarment Proceeding.**
While a prosecuting officer should not allow his zeal in the
performance of a public duty to lead him into a persecution of
the accused, yet he should be allowed a full performance of
that duty, unhampered by the embarrassment of disbarment pro-
ceedings.

Original proceeding for disbarment.

COMPLAINT DISMISSED.

*S. J. McWilliams* for petitioner.

*Schree, Conrad & Wenchorff* for respondent.

ELLISON, J.—On the 19th day of August, 1911,
proceedings were instituted in this court by Ernest D.
Martin, an attorney at law, as complainant, for the
disbarment of Leslie J. Lyons, a licensed and practic-
ing attorney in the courts of this state, based on the
following charges as set forth in his abstract:

"1.   That said Lyons, while prosecuting attorney
for the United States, illegally maintained a secret
copartnership with one George L. Davis, an attorney,
who accepts employment in defense of criminal cases,
brought and prosecuted by said Lyons, contrary to
and in violation of section 1039, Revised Statutes of
Mo.

2.   Disregarding the truth, violating his oath, de-
ceitfully suppressing the facts and recklessly caus-
ing investigations of Interstate Railway Co. and its
officers to be made a matter of public notoriety, . . .

3.   Artfully procuring valuable property from
promises and agreements, and then deceitfully and im-
properly withholding same from its owner.

4.   Maliciously drafting an indictment containing
statements which he knew were false and untrue, and
unlawfully influencing a Federal grand jury to return
same as true bill.

5.   Appressively using the force and power of his
official position for personal advantage and private

162 App.—44

gain; corruptly levying tribute upon, or accepting employment from persons, corporations, land schemes, lottery organizations and others, in order that they might be protected from annoyance, interference, investigation or prosecution.

6. Unprofessionally soliciting business, taking cases away from other lawyers, employing methods commonly known in legal parlance as "Snitching," in the following case, to-wit:

A. Snitching case No. 45377, Circuit Court Jackson Co., Mo., entitled K. C. So. Ry. Co. v. Papolonisis et al., from one Ralph E. Schofield.

B. Snitching case No. 52858, Circuit Court Jackson Co., Mo., entitled Link v. Baumgardt et al., from one Judge Ed. E. Aleshire.

C. Snitching case No. 14999, Dist. Court Wyandotte Co., Kas., entitled Woodcock v. Woodcock, from W. H. McCamish.

7. In the papers in case No. 18492, District Court Wyandotte Co., Kas., entitled Bowers v. Jett et al., said Lyons is charged with being guilty of conspiracy, graft, fraud and deceit practiced upon his client and other interested parties.

8. Malpractice, deceit and misdemeanor, intering with due course of law, and other crimes in the following cases, to-wit:

A. Ehlers v. Wolforman, interfering with justice.

B. State v. Wolferman, attempting to remove a state witness.

C. U. S. v. Ehlers, attempting to deport a female.

D. Adams v. Adams, soliciting a bribe.

E. U. S. v. Pickerill.

F. Arnold v. Cohn et al., malicious interference.

G. U. S. v. Colt, suppressing evidence.

H. Huckle v. Hendrickson, using government in attempting to enforce settlement of a private claim."

These charges were referred to Thomas A. Witten, Esq., of the Kansas City bar, as a commissioner, to take the evidence offered by complainant Martin and respondent Lyons, and to report the same to this court without himself stating any conclusion of law or fact. In obedience to such reference the parties appeared before the commissioner in person and by counsel, and after an extended hearing .and much labor by Mr. Witten, he has returned into court more than nine hundred typewritten pages of evidence, besides a number of exhibits.

Lyons is United States District Attorney for the Western District of Missouri, and prior to his appointment by the President to that place, was assistant district attorney. It appears that Martin was engaged, with others, in the promotion of a railway from Kansas City, Missouri, passing through Kansas, to St. Joseph, Missouri, and known as the Interstate Railway Company. Among his associates were two men, Avery and Freundlich. Martin was vice-president and general counsel of the company and active, with others, in its management. Officials of the postoffice department of the Federal government seem to have thought proper to investigate the affairs of the company connected with the means used to promote the road, and had postoffice inspectors to look into its affairs. The result of this was that the evidence obtained by them was placed before a United States grand jury, through Lyons as district attorney. On the 3rd of March, 1911, the grand jury returned one indictment against Martin, Avery and Freundlich, and another against Avery and Freundlich, charging them with using the United States mail for fraudulent purposes in the sale of stock and otherwise obtaining money for the promotion of the railroad.

It appears that a month or more before the indictment was found, it became known that the postoffice department was conducting an investigation with

a view to having the offending parties prosecuted, if the evidence justified such measure, and Martin employed his present attorney in his defense, and that such attorney wrote to an assistant district attorney informing him of rumors that a prosecution "by your office" would be begun in a short time against "a number of former officials of the Electric Traction Construction Company," which we take it was an outgrowth of the railroad company, stating that he was attorney for "Avery, former secretary of the company, and of Jeff J. Reed, former president, and a number of other gentlemen who are indirectly connected with the company;" and that his understanding was that the investigation was still going on "in the office of the postoffice inspector and that no formal complaint has yet been made to your office." The letter made formal request that the district attorney grant them a hearing before any radical steps were taken by his office. Lyons, himself, answered this letter, on the 21st of January, 1911, treating it as a request in Avery's behalf and stating that he would give him an opportunity to be heard if he should be requested to present the matter to a grand jury. Martin alleges that prior to this time a postoffice inspector (acting upon the suggestion of Lyons) requested to see the records, documents, books and papers of the Interstate Railway Company for the purpose of examination, and that they would be kept private and returned in a few days, and that he thereupon gave over to the inspector a large number of books, papers, etc., belonging to the company. That Lyons refused to return these papers and documents, and, as already stated, caused an indictment against him. Martin then alleges that a few days after the return of the indictment, "one George L. Davis represented to him that he was a close personal friend of Lyons, that he had discussed the case with Lyons, that Lyons had admitted to him that the charges contained in the in-

dictment, in so far as they related to Martin, were without foundation and that he had no evidence upon which to base them; that his relations to Lyons were confidential, though no more, and that he was in a position to fully represent him in his defense and that owing to his long friendship he was in a position to render valuable assistance in obtaining a speedy trial and disposition of the case." That relying upon these representations, he employed Davis as his attorney to assist his other attorneys in the preparation and defense of his case, and then and there paid him twenty-five dollars.

Martin then alleges that he afterwards was informed that at the time of such employment and prior and since then, Davis was Lyons' "secret partner" in the practice of law and that said partnership "was secretly conducted, each of the parties sharing in the profits and earnings of the firm," all of which was unknown to the public. That by reason of said partnership and Davis' employment, Lyons became possessed of facts connected with his defense. That said indictment is a "vicious and unwarranted assault on" him, Martin. That it was procured by Lyons misconstruing and perverting and garbling the evidence and documents obtained from him as already stated and in Lyons refusing to give him "any opportunity to explain the same, or to give the grand jury an intelligent idea of the matters or things then being investigated."

Martin then charges that the grand jury at first refused to find an indictment, whereupon Lyons appeared before them and insisted upon a bill being found, that "it was necessary for his purposes" and that there would be no hardship in so doing, as, if he was innocent he would be cleared by a trial in court, and thereby persuaded them to find the indictment above mentioned.

It is then charged that Lyons refused to return the papers gotten of him, as has been already described, but on the contrary, without notice to him, had procured an order of court directing them to be placed with the clerk of the court, to be retained by the clerk for Lyons' inspection and use.

Reserving for separate consideration that part of the charge that Lyons and Davis were partners, and taking up the principal complaint relating to improper and unlawful conduct on the part of Lyons in procuring the indictment against Martin, we find it wholly unsupported by the evidence. Seven members of the grand jury were called as witnesses. None of them testified to an impropriety on Lyons' part. It seems that Avery, as expressed in evidence, had "fled the jurisdiction of the court" and was under arrest at San Francisco, California, and Lyons told the jury that they should "pass upon it (the indictment) one way or the other at an early date—as soon as possible," as he could not be held out there any great length of time. These members of the jury had their attention called to Avery doubtless from the circumstances of his being under arrest in a distant state. One of them stated that Lyons said we ought to find an indictment. He also stated that Lyons said that the main man was Avery but he wanted Martin as he was in with Avery, and that there was not very much against Martin. But, as we have said, there were two indictments, in one of which Martin was not included and on cross-examination the juror said that Lyons may have been talking about the latter; that he did not remember. The testimony of the jurymen, considered together, leaves no doubt of the propriety of Lyons' action in the matter. They stated that he did not undertake to influence them, confining himself to placing the evidence before them and retiring when they were considering what action they would take.

The testimony on the subject of getting and keeping the papers, documents, etc., belonging to the railway company, likewise fails to show any misconduct on the part of Lyons. It seems to us that the position taken by Martin himself demonstrates this. He says that he turned them over to the inspector willingly, and about all we can see in the entire matter is merely that they were not returned, and that was explained in the following way: Martin filed a motion in the Federal court asking an order for their return. It appears that early one morning before the arival of Martin's counsel, Lyons called attention to the motion and explained its purpose, whereupon the court ordered that the papers be placed in the custody of the clerk. It is true that this occurred after the papers had been used before the grand jury and the indictment found, but it was before the mistrial, which took place afterwards, where, of course, they would be needed as much as they were with the grand jury. When Martin's attorney appeared in courtroom he found the motion had been disposed of and the order made for delivery to the clerk. He immediately saw Lyons and the latter explained that the morning was disagreeably warm, the judge was anxious to get through with whatever needed attention, and finding no one present representing Martin, the judge had made the order. He showed the attorney a decision of the Supreme Court of the United States wherein it was said that the officers were justified in keeping possession of papers of that nature, to be used as evidence. But as the order had been made in the absence of the attorney, he offered to immediately have it set aside and again considered or set for hearing at any other time that suited the attorney's convenience. The latter, after reading the decision referred to, said he thought he could do nothing further, and the matter thus ended.

We regard the further complaint of misconduct, in Lyons not permitting Martin to explain to the grand jury the matters connected with the accusation against him, as unreasonable. In the first place, we do not understand it to be the duty or the custom of the official prosecutor to call accused parties before the grand jury. An investigation by a grand jury is secret and ex parte. The constitutional right to a hearing does not apply to a hearing before an accusation is made. The written request to Lyons' assistant for an opportunity for explanation "before any radical steps were taken by his office," did not disclose that inquiry was being made into Martin's acts, but into those of Avery and Freundlich, "and a number of other gentlemen who are indirectly connected with" the Electric Traction Construction Company. Lyons' answer shows that he regarded the request as made in behalf of Avery, and he testified that at that time he did not know Martin, or of his connection with the promotion of the railway, and that when he came to examine into the matter he found that Avery had fled, and he did not think it wise to confer about the matter with his counsel.

The charge of Lyons' partnership with Davis in the practice of law, to which we have already referred, is based upon the assumption that such partnership was forbidden by the statutes of this state. The different special acts of Lyons and of Davis are set forth at length, including division of fees, and then closes with these words, "and that the said George L. Davis regularly appears before said district court in defense of persons charged with misdemeanors or felonies, all of which is in violation of section 1039 of chapter 10 of the Revised Statutes of Missouri of 1909." That statute prohibits any lawyer who is a partner of a prosecuting attorney in this state from "appearing for or defending in any of the courts of this state any person charged with a misdemeanor or

felony." The next section (1040) fixes the penalty for such offense at a fine and a forfeiture of his license to practice law in this state.

It is apparent that that statute relates alone to partnerships with state prosecutors and that it does not apply to a partnership with a United States district attorney. But we will not, on that account, refuse further consideration of the matter, for though the statute alleged to have been violated does not refer to a Federal district attorney or his partner, the particular specifications of the charge involve grossly reprehensible conduct and dishonesty. That is to say, if Lyons and Davis were secret partners and the latter was regularly defending persons in the United States district court and dividing fees with the former, as charged by Martin, it would justify disbarment from practice on common principles of honesty and morality, regardless of affirmative statutory condemnation. "Too much is staked upon the honesty and good conduct of lawyers for courts to wink at flagrant misconduct. They are trusted by the community with the care of their lives, liberty and property, with no other security than personal honor and integrity." [In re Henderson, 88 Tenn. 531, 539.] "Integrity, as well as skill and learning, is essential to the character of the profession, and it becomes the duty of the bench, as well as of the bar itself, to preserve that character in its highest state, as a means of usefulness, and of answering the true end of a profession so honorable and at the same time so needful." [Dickens' Case, 67 Pa. St. 169, 177.] It was said in an address by a noted lawyer before the American Bar Association, in 1910, that "the devil and the lawyer come together into conflict;" and that "This conflict must be waged according to law."

But notwithstanding the great breadth of the charge, there was no evidence offered to sustain it, save in the single instance of Davis taking part in the

early stages of the case against Martin, and it was conceded in court, at the argument in this proceeding, that that was the only occasion. Much of the record is taken up with an attempt to show a partnership in the general practice in civil business; but, under the law of our state, a partnership between a public prosecutor and another lawyer, in civil business, is not unlawful, nor is it improper, and we have not been advised of any Federal statute against it. Many of the state's attorneys throughout this state have partners when elected to that office, and it has not been thought to be necessary for them to sever such relations while in office, though, of course, the partner obeys the statute, as well as his own sense of propriety, and does not defend in criminal cases.

So therefore, in order to sustain this charge, it is necessary that the evidence should show that they were partners when Davis was defending Martin. Now the association of Lyons and Davis was shown to be a most natural thing. Undisputed evidence discloses that they were natives of the same county and attended school together at the Kansas University, graduating near the same time. They were friends. Lyons came to Kansas City in 1900, and Davis in 1907. Lyons was then assistant United States district attorney, but in partnership with Mr. Finlay in civil business. The firm needed a man and Davis needed employment and Finlay & Lyons, presumably on the latter's recommendation, took him in at twenty-five dollars per month and afterwards raised it to fifty dollars. That firm dissolved and afterwards, in June, 1910, Lyons was appointed United States district attorney. He had a civil business and realized the necessity of assistance in correspondence, examining authorities, preparing opinions, and sometimes in the trial of his cases. He arranged with Davis to occupy one of his, Davis', rooms with his desk, typewriter and stenographer. He paid Davis for his work and

In the matter of disbarment of Lyons.

frequently turned over to him business to which he, Lyons, could not give proper attention. Davis has at times helped him in the trial of civil cases and he has, as is customary with lawyers, divided fees with him. In consideration of the employment and practice Davis thus gets through Lyons, Davis does not charge him any rent for his room. A young man named Wagner, a friend of Lyons, is reading law in the office and the individual names of all appear on the door of the office, together with those of two other lawyers who have offices next to them and who make use of the library. Davis, though he had passed his examination at the state capitol and had a license to practice, had not been presented or enrolled with the courts at Kansas City and for a time had permission to use Lyons' name in some of his business, and after he was enrolled he signed his own name, though frequently Lyons' also. A number of records were put in evidence to show this, but in no instance does a partnership name appear, there being simply the separate individual name of each, as in cases where two or more separate lawyers are conducting a single case.

It was shown that letter heads were gotten out with the separate full names of Lyons and Davis as ''Associated Attorneys at Law.'' But this was after these proceedings were begun and cannot reasonably be interpreted as an advertisement of a partnership, publicly issued at the time accusations and denials of a partnership were being made. It is not usual for an accused to voluntarily issue public proof of a charge which he, at the same time, is denying. It was explained that the letter heads were for Davis to use in his correspondence concerning business in which his assistance had been engaged by Lyons; and it was shown that each used individual letter heads in the general correspondence of each.

Martin's attorney testified that a short time after the indictment was found he was sent for by Lyons,

who, in presence of Davis, told him he had heard that Martin had stated he had employed Davis to assist in his defense on account of favors which he was to get from him, and that Davis had not "delivered the goods," and that he, Lyons, had decided that Davis could not take criminal cases in the United States court and occupy offices with him. He further testified that he thereupon assured Lyons that he was responsible for Davis' employment and that it was not expected that Davis was to take "any part in the case that was not legal or that he was to get any favors out of him that were not proper." He also testified that Lyons "said he was glad to hear me say that because he did not want the report to get out that Davis was employed to get favors out of his office. That it was not true. That he could not get favors and that Davis knew it. I assured him I did not think the reports true."

Notwithstanding this disclaimer on the part of the attorney, we are compelled to notice, as bearing on Martin's motive, that, according to his sworn complaint originating this proceeding, and which we have set out in the fore part of this opinion, he allowed Davis to approach him seeking employment in his defense on the ground of his knowledge of what Lyons thought of the case and of his close friendship and confidential relations with him enabling him, Davis, to get a speedy trial and disposition of the case; and that for those reasons, "relying upon said representations," he employed him. Taking this testimony of the attorney, showing Lyons' concern, his denial, and his request for an explanation, together with these allegations in the complaint, as well as the conceded fact that no sign of favor was ever granted, and that the prosecution was in no way lessened and has in no way ceased, we think it is a strong circumstance in behalf of Lyons on the issue of partnership.

It will be noted that the allegation is a "secret partnership," and by the use of italics in the charge, stress has been put upon its being secret. Yet, singularly enough, all of the evidence brought forward to prove it was of acts of the most public character,— Davis' appearance in open court in some of Lyons' cases—the signing his name to pleadings in cases, and painting the names of each on the door of a public office. These acts are the reverse of secrecy or concealment, and must have been not regarded by complainant as showing a partnership; and therefore the charge, in effect, is that notwithstanding the outward show of separate individuals, there was between them a secret understanding or contract of copartnership; and of this there was not the slightest proof.

There being no partnership shown, no impropriety can be charged to Lyons on account of his knowledge that Davis had accepted employment from Martin.

Lyons is next charged with levying tribute upon, or accepting employment from, persons, corporations, land schemes, lottery organizations and others, in order that they might be protected from prosecution. The particular specification concerns a corporation known as the "Oregon L and Company," owning a vast body of land in the state of Oregon, said to be from three to six miles wide and three hundred miles long. The description and mode of sale of this land is given by its officers, who were called by Martin. It, or a similar company, was organized in 1903, and Governor Hadley was its attorney.

As we understand it the charge is that this company was engaged in an unlawful effort to beguile and cheat investors in land, and so as to be safeguarded against prosecution for its nefarious schemes, its officers employed Lyons as its attorney. The evidence in support shows that written contracts of sale of undivided parts of the whole, of different

sizes, were sold in a number of states through agents. Specific tracts then were bought, at an appointed time, at an auction sale, no one being allowed to bid except those holding contracts. The auction sale took place at Lakeview, Oregon, in September, 1909, Holders of contracts numbered 14,000, and were mostly represented at the sale by agents selected from among themselves, and 500 of these attended. Abstracts of title covered 900 pages, and Lyons examined these and he was shown to be the attorney of the company. He so testified himself.

Instead of the reason for Lyons' employment being that he was United States district attorney, it appears that at this time he was assistant attorney and that he had been attorney for the president of the company, individually, before its organization and before he was assistant attorney. But in addition to this, it appears from the evidence that Mr. Hadley was the original attorney for the company, prior to his election as Attorney General, and that he had examined into the nature and object of the company's business and had submitted the matter, with the forms of contract, to the department at Washington, where it was determined to be unobjectionable to the law. The evidence further shows that when Mr. Hadley became Attorney General and retired from the attorneyship for the company, he recommended Lyons for his successor.

However, a scheme lawful in itself may be unlawfully carried on and we have gone over the evidence to see if there was anything of that kind in this case. We do not find any. Taking the evidence in the case as our guide to a conclusion, in connection with common knowledge of human nature, there were fewer complaints made of this entire affair representing 14, 000 transactions, with as many different people, than are .ordinarily found in business dealings. So far as the record shows, the parties who organized and

managed this company are solvent (the record is silent), and yet no action in court was ever begun against them. The United States district attorney, let him be ever so willing, could not grant protection to crime committed against the citizens of this, or other states, having their own laws and prosecuting officers; and yet no suggestion is made that any prosecution for obtaining money by trick or device, or by false pretenses, has been instituted against the owners and managers of the company. More than that, the evidence shows that this company's operations extended over other states, where United States attorneys, other than Lyons, could institute prosecutions if justified by the facts.

Another charge is "unprofessionally soliciting business and taking cases away from other lawyers." The specifications under this charge are that he took a case from Mr. Aleshire and Mr. Schofield, attorneys in Kansas City Missouri, and Mr. McCamish, an attorney in Kansas. The record does not show justification for the accusation in either instance. The first of these cases was Link v. Baumgardt. Mr. Aleshire was employed by Link and drew the pleadings. He testified that after the suit was instituted Link asked him if he "could handle the case on a ten per cent contingent fee, and I told him I could not. Later on, Link told me another party was going to handle the case for him. I never talked with Lyons about the case." Mr. Aleshire was paid for his services. It further appears that Lyons afterwards prosecuted the case. Link entirely exonerated him from any blame or impropriety. He testified that he consulted Mr. Wagner, who was his friend and was reading law with Lyons. He said, "I told young Wagner that I was looking for an attorney and told him of my trouble and asked him something about the estate he inherited, and he stated that Lyons had handled that and straightened it out for him. I asked him if he thought Lyons would

handle my case on a ten per cent basis. He told me he thought he would, and I went to Mr. Lyons.'' He further testified that Lyons told him he would have nothing to do with the case unless he settled with and satisfied Mr. Aleshire.

The next case was a condemnation proceeding against Papolonists (a Greek). The defendant testified through an interpreter that after he had employed Mr. Schofield, he asked one of his countrymen about a lawyer and was recommended to Lyons and that he afterwards got a friend as interpreter and went to Lyons. Lyons asked for the papers and he told him he had left them with some attorney but did not tell him who, when Lyons said ''bring me the papers and I will look at them.'' The case did not come to trial and he concluded Lyons was too busy and returned to Mr. Schofield.

The last of these cases is that of Woodcock v. Woodcock, a partition suit in Kansas City, Kansas. It seems there was a mortgage on the premises for a sum sufficient to make the interests of the owners of little value. Mr. McCamish brought the action for plaintiff. Mrs. Woodcock, the plaintiff, consulted a lawyer in another county, who was an uncle of Lyons. The pecuniary interests being small, he asked Lyons to examine into it. The latter found that he could secure to Mrs. Woodcock a homestead claim for a period of eighteen months and that he could utilize that to her advantage. He got $350 for it. The costs and attorneys' fees, of fifty dollars, used up $150 of that, and he paid over to Mrs. Woodcock the remainder. There were four lawyers, including Mr. Mc-Camish and Lyons, each getting twelve dollars and fifty cent. There is not the slightest evidence that Lyons took the case from McCamish.

Connected with the last charge is one that in one of the suits in Kansas, connected with the Woodcock partition suit, Lyons was charged with being guilty

of "fraud, collusion and conspiracy." The charge in
that suit was contained in a replication to an answer
and was that the four attorneys (Lyons being one of
them) in two other cases had secured an order in the
Kansas court for sale of the land in litigation and
payment of the proceeds of the sale on a certain judg-
ment. The upshot of the whole affair is that in a
court pleading some lawyers had charged Lyons and
others, with fraud, collusion and conspiracy. There
was not a particle of evidence that this charge was
true, and we dismiss the matter without further re-
mark.

The last charge is of "malpractice, deceit, misde-
meanor and interference with due course of law."
The first three specifications under this charge relate
to the same matter and may be considered together.
It appears that Emma Ehlers, a young woman lately
from Germany, through New York City, accused one
Wolferman with criminal conduct with her. There
was a prosecution in the state court and a civil suit
against him. Wolferman was acquitted in the state
case and the civil suit ended in some way which does
not appear in evidence—one witness said it was com-
promised. While these cases were pending, a Federal
officer from the Department of Commerce and Labor
came to Kansas City to serve a writ upon her. The
object stated was to prevent the Statute of Limitations
from running in case she became dependent and it was
desired to deport her under the Federal law. The
officer was prevented from seeing her and he went to
Lyons, as a government official, for assistance. Lyons
called up her attorney and told him that if he pre-
vented the officer from serving the writ, he would be
compelled to proceed against him for interfering with
precess. The writ was then served. It was not the
purpose to deport her then. It was not shown that
Lyons had any interest in the matter, nor is it pre-

162 App.—45

tended that he had anything to do with the cases in which she was concerned. He stated the matter of her deportation was within the jurisdiction of the officials in New York City and advised the officer to send the result of his action and investigation to the proper officer in that city. Whatever interest, if any, Wolferman may have had in getting the young woman out of the country, there is nothing tending in any degree to show that Lyons was connected with it; or that he did anything more than perform his plain duty in warning the parties concerned not to secrete the woman from the officer's process.

Specification "D", under this charge, called "solicting a bribe." The evidence showed that Lyons was attorney for the wife in an action brought against her for divorce, and nothing was shown having any tendency to show a bribe was asked.

Specification "E" is called "United States v. Pickerell." It appears that Pickerell was charged with sending obscene matter through the mails, and the complaint against Lyons is that he acted unprofessionally in attempting to keep Pickerell's lawyer from getting a fee for his defense. Pickerell had illicit relations with a Mrs. Tanner, a weak-minded woman (whom her father had put in charge of a servant and placed in a sanitarium), and when he was arrested the lawyer got his brother-in-law, Cohen, to go his bail, and the two procured the woman to convey her property to Cohen by warrantly deed, which her father had given her. At the same time contracts were obtained for an exorbitant fee for the lawyer, including "a percentage of the value of her furniture," and to compensate and indemnify Cohen for signing Pickerell's bond. This deed, presumably, was to secure these contracts. When the woman's father learned of this, he undertook to protect his daughter by employing Lyons to bring an action to set aside the deed.

Why this commendable act by Lyons in endeavoring to aid the father in his effort to thwart this deal and save his daughter's home, should be set up as a cause for disbarment, we cannot understand.

The next charge is that Lyons suppressed evidence in the case of United States v. Colt. It appears that Colt was indicted and convicted in the Federal court for misuse of the mails in connection with what was termed a fake loan or brokerage business. Before the trial, Colt's mother and his lawyer called on Lyons, representing that Colt was a good faith broker and that it was preposterous to say otherwise. They spoke of numbers of people, in New York City and other places, that he was authorized to represent. Lyons expressed a willingness to investigate and they gave him a list of parties or names, addresses and loans with which Colt was connected. Lyons testified that he turned this over to a secret service officer representing the Department of Justice, for investigation, who reported that he could not find that Colt had any connection with most of them. The paper or list was not returned to Lyons by the officer and consequently was not returned to Colt's mother or his attorney. Lyons testified that it was a mere list of names on a sheet of paper, and no suggestion was made that he should return it, and that he had no idea it was expected that he should; and that he never knew they wanted it until one evening during the trial of the case, no notice ever being given him to produce, and that he was called by the defendant as a witness and stated all his connection with the paper and what was on it. There is a total failure to show any thought, or attempt, on Lyons' part, to suppress evidence, or that there was any impropriety in what he did.

The next and last charge included in Martin's summary of the charges, relates to "using Government in attempting to enforce settlement of a private claim," in a trade between Huckel and Hendrickson.

Lyons had been Huckel's lawyer for several years and it appears that Hendrickson traded a large number of horses running on the range in Arizona, to Huckel, for four automobiles, two of which were delivered. It was shown in evidence that Hendrickson had traded for the horses with one Smith, said to be president of the United States Live Stock Company, at Omaha, giving him, Smith, ''a section of land and an automobile.'' He gave Smith, so the latter testified, an old automobile and ''a section of land'', for ''400 or 500 head of horses'' running on the range in Arizona. Huckel went out to Arizona and failed to find any horses and was informed there that Smith was selling horses which did not exist and when he got out of horses he had on the range, he would sell those he had on paper. Huckel returned to Kansas City and Smith was down from Omaha. He figured largely in the attempt made by Huckel to get a settlement with Hendrickson. He was a horse trader, and testified that he traded horses for land, and for money when he could get it. He seems to have been in many places over the western country, having lived in several towns in Nebraska, as well as in Wyoming, and South Dakota, where he had a saloon; and had also been a cowboy in Colorado. Huckel got Lyons to assist him to adjust the matter. They all met at Huckel's garage. As Smith traded the horses to Hendrickson, the question whether there were any horses, and if so, where, naturally was propounded to Smith. It was suggested that the whole affair was a fraud. Smith grew quite belligerent and there was testimony that Lyons said he would have him arrested. It was stated and denied that Huckel had introduced Lyons to the others as United States district attorney. The conference ended by Smith agreeing to gather up the horses in Arizona and load them for shipment at five dollars per car, which Huckel was to pay. A written agreement to that effect was written by Lyons and sent to Smith at

Omaha, but he failed to sign, saying that his "company" (of which he was president) refused. He expressly stated in his testimony that nothing that was done in the settlement was caused by Lyons being United States district attorney, and that "that cut no figure." There was much other evidence of this transaction, but nothing justifies the allegation that Lyons, in the language of the charge, was "Using (the) Government in attempting to enforce settlement of a private claim."

Some of the foregoing charges were of rather indefinite nature too much so under the rule of pleading in such cases (Weeks on Attorneys at Law, sec. 83, p. 176). But the respondent has not made objection on that head and so, in consequence, we have not.

The foregoing is a review, as comprehensive as can be made within reasonable limits of an opinion, of the charges quoted at the outset. There were one or more other charges which seem to be abandoned and have not been urged here. The evidence purporting to sustain them contains nothing derogatory to Lyons.

In addition to those, there was one charge of a very serious nature that occupied much of the time of the commissioner and which made up a large part of the record. There was no evidence offered to sustain it that, under any rule of evidence, could be received against Lyons. Nor was there the slightest proof that he ever knew anything connected with the subject of the accusation. After making so grave a charge and spending such length of time in endeavoring to sustain it, it was abandoned and withdrawn at the argument.

It cannot escape the attention of any one examining the record, that the moving cause of this effort at disbarment is the fact that Lyons was performing an official duty, as he saw it, in prosecuting the complainant for an alleged violation of the Federal law,

There is no suggestion in the record of any reason why he should desire to persecute him. He was neither his enemy nor his friend. He did not know him, and the vigor of his prosecution, as disclosed in evidence, shows that it was not from any base design. We are not aware of any suggestion of motive save that he thought him guilty, and the fact of the mistrial, re-' ferred to in argument, is persuasive evidence that reasonable cause for the prosecution was not wanting. We note in the testimony in this case of complainant's attorney in that case, he being also his counsel in this case, that in addition to trying through Lyons to prevent an indictment, as we have above shown, he, in an interview with Lyons some months after one was found, "tried to show him that he ought to dismiss it, but did not satisfy him." He then added that "these charges were filed two weeks after."

No impeachment of reputation was attempted by the complainant, yet Lyons, exercising his right in that respect, called several leading citizens as to his life and character. These were his teachers when a boy and young man, members of the bar, in the front rank of the profession, and leading business men of the city. These did not testify in a mere formal manner. His teacher told of his making his own way and of the excellence of his character, and so did employers. One lawyer who has observed him since he began the practice, stated his reputation as an official and a man was "as good as could be, so far as I know, and I will add, so far I believe." Another, who had been a trial judge, had observed him from the bench and in the practice. He said his reputation "is good—excellent," and he had never heard it questioned. Another ex-circuit judge said of his reputation, officially and otherwise, that "it is very good—the very best." Another said "I have always considered him a man of high professional ideals—as a citizen I

would trust him, I think, as far as any lawyer I know at this bar.''

A business man, president of the commercial club, testified that ''I have had a very intimate acquaintance with him. We have been associated in many affairs socially and in church work and matters of that kind quite closely; and in public matters, movements of that class and character. I certainly do know Mr. Lyons' reputation. I class him as one of our best citizens. I only wish the Lord would send us 100,000 more like him.''

It seems to us apparent that the controlling motive behind this proceeding is not to purify the bar. But that complainant, smarting under a prosecution which he deems unjust, has allowed his feeling of resentment to lead him to an attack on the district attorney. While a prosecutor, Federal or state, should not permit zeal in performance of public duty to lead him into persecution, yet he ought to be allowed a full performance of that duty, unhampered by the embarrassment of disbarment proceedings. Our finding is that the charges are not supported by the evidence, and the proceeding will be dismissed. The other judges concur.