## Commonwealth ex rel. Pike County Bar Association v. Stump.

(Decided Feb. 10, 1933.)

J. W. CAMMACK, Attorney General, J. M. GILBERT, Assistant Attorney General, and A. F. BYRD for appellants.

J. C. HOPKINS, STRATTON & STEPHENSON and W. W. BARRETT for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On October 23, 1930, the Pike County Bar Association in the name of the commonwealth of Kentucky, filed in the Pike circuit court, an information in which there were embodied 11 distinct charges or grounds, which, if true, exhibited such conduct as that the informants concluded were sufficient to authorize the court to revoke respondent's license to practice law, and the court was asked to issue its rule against him to ap-

pear and show cause why he should not be disbarred. The rule was issued as prayed for, and respondent appeared and denied in toto each ground preferred in the information; but he also interposed two pleas against the right of the court to entertain the motion or proceeding, and which are: (a) That in August, preceding the date of the filing of the information, a similar one was filed in the court by the same movant asking for the same relief, i. e., the issuing of a rule against respondent to show cause why his license to practice law should not be revoked, and that upon a hearing thereof the court overruled the motion and declined to issue the rule, and respondent relies thereon in bar of the present proceedings; and (b) that respondent was at that time the commonwealth's attorney for the Thirty-Fifth judicial district in the commonwealth, and that if the rule should be made absolute on final hearing and a judgment of disbarment entered it would ipso facto disqualify him from holding the office to which he had been elected, and thereby result in his impeachment, which he contended could not be done, except in the manner pointed out in the constitution, i. e., a preferment of impeachment charges by the lower House of the General Assembly, and a trial and conviction therefor by the Senate; and which he also relied on in defense of the disbarment proceeding. It will be seen that both of those pleas are in bar of a hearing of the charges on the merits, and in discussing them they will be referred to by our designations. It will be necessary to dispose of them in advance of a consideration of any of the grounds alleged in the information.

In disposing of plea (a) we deem it necessary to only call attention to the ground upon which it is based, including the record upon which it was made. All that was before the court at the hearing, following the filing of the first information, was that document. Its contents were all that was necessary for the court to examine or consider in determining whether or not he would issue the rule prayed for therein. Such a proceeding is closely analogous to the filing of an affidavit before an officer authorized to issue a warrant of arrest for the purpose of procuring one against the person therein named, in which case it is the duty of the officer to issue the warrant if sufficient facts therefor are contained in the affidavit. The rule asked for in this case does not imply that the respondent named therein is

guilty of the charges preferred against him in the information any more than is the defendant arrested under the warrant thereby presumed guilty of the offense charged in it or the affidavit to procure it. The guilt or innocence of the one charged in either case is to be subsequently determined upon proper arraignment for that purpose. Therefore, in this case the court, when the first information was filed against respondent, should have only examined the grounds stated in the information, and, if any one of them were sufficient to authorize an investigation, to then issue the rule citing respondent to appear and defend, after which, if issue was made, would be the only proper time to investigate and adjudicate the merits of such charge or charges. Therefore, the denial of the rule at the time it was first applied for no more involved the merits of the case than would a refusal of the court to issue a warrant upon a sufficient affidavit bar the right of the same or another court to later issue a warrant upon the same facts contained in another affidavit; and that, too, regardless of whether or not the defendant in the one case, or respondent in the other, attempted to inject into or force upon the court a meritorious defense in opposition to issuing the warrant in the one case or the rule in the other. We therefore conclude that this plea (a) was and is unavailable.

Our conclusion is that plea (b) must share the same fate. In the annotation found in 9 A. L. R. on page 189, but beginning on page 197, the annotator says: "Acts of a prosecuting attorney in violation of his oath of office and against good morals are sufficient to justify his disbarment or suspension from practice." In support of that statement the annotator cites these cases: Re McGowan, 175 Cal. 51, 170 P. 1100; People ex rel. Colorado Bar Asso. v. Anglim, 33 Colo. 40, 78 P. 687; People ex rel. Stead v. Phipps, 261 Ill. 576, 104 N. E. 144; Re Norris, 60 Kan. 649, 57 P. 528; Re Disbarment of Lyons, 162 Mo. App. 688, 145 S. W. 844; Re Simpson, 9 N. D. 379, 83 N. W. 541; Re Voss, 11 N. D. 540, 90 N. W. 15; Re Sitton, 72 Okl. 13, 177 P. 555; Re Jones, 70 Vt. 71, 39 A. 1087, 1090, and State v. Hays, 64 W. Va. 45, 61 S. E. 355, 356.

They all sustain the principle embodied in the general statement of the inserted excerpt from the annotation, and which the court in each case fortifies by the

most logical and convincing reasoning. In doing so they point out that the loss of the office in case of disbarment is only an incident thereto, which results as a consequence of the loss of the right to practice law, since the prosecuting attorney is, most generally at least, required to be a member of the bar and have license to practice law as a prerequisite to holding his office, and if he is deprived of such license he is no longer qualified to fill the office. They also correctly hold that the purpose and object of the disbarment proceeding is not to deprive the respondent of his office, but only to take away from him a necessary qualification to hold it, and which is no more an impeachment proceeding than if the officer should remove from the state and become a nonresident, thereby disqualifying him from holding the office, and a controversy should subsequently arise as to whether or not there was a vacancy in his office. In that case the result of a determination by the court of the permanent removal of the officer from the jurisdiction would necessarily result in the forfeiture of his office as effectually as if he had been impeached; but surely it could not be insisted that the agency of government who had the right to appoint a successor, or a court who might be called upon to determine whether or not there was a vacancy, would be deprived or barred from performing such duties, because the result would be as effectual to deprive the incumbent of his office as would follow a finding of guilty on a charge of impeachment.

Both in the illustration, and in a disbarment proceeding, such as we have here, the officer and respondent would be the producer of his own disqualification, and the following investigation would be only for the purpose of ascertaining and determining whether or not the disqualification existed. Moreover, it is very pertinently stated in those opinions, or some of them, that the office of prosecutor constitutes no shield or protection to the incumbent from a failure to observe his oath and consequent duties as an attorney at law; the comments of the court being to the effect that his oath of office rather enlarges his obligations of uprightness, honor, and rectitude than as serving as a protection to him from the consequences of their nonobservance, since in accepting the office he makes the sovereignty (that he takes an oath to serve) his client and agrees under oath to faithfully and uprightly do so, and which

in part consists in impartially prosecuting the guilty as well as to protect the innocent, and to not deviate from either course for any corrupt or selfish motive. Text-writers on the subject coincide with the annotation referred to, and we deem it unnecessary to lengthen this opinion by a citation of them. A contention of a similar nature was made in the case of Commonwealth v. Rowe, 112 Ky. 482, 66 S. W. 29, which was a prosecution against a commonwealth's attorney for the Sixth judicial district on a charge amounting to malfeasance in office. No impeachment proceedings had been preferred against him; nor had he been impeached. In overruling the contention the court considered our various applicable constitutional and statutory provisions, and held that a successful impeachment proceeding was not a condition precedent to the prosecution of the officer for the malfeasance charge.

But it is argued that the Rowe Case is not applicable, since it was a prosecution against the officer for the commission of a crime, and which section 68 of our Constitution expressly permits and authorizes in advance of impeachment, notwithstanding the commission of the acts constituting the crime may also be cause for impeachment; the language of the section relied on being: "But the party convicted (under impeachment proceedings) shall, nevertheless, be subject and liable to indictment, trial and punishment by law." Clearly, the only purpose intended to be accomplished by the employment of that language was to prevent the judgment in an impeachment prosecution from becoming a bar to a criminal prosecution based upon the same acts of omission or commission that were investigated and determined in the impeachment proceeding. No language in that or in any other section of the Constitution, or in any section of our statutes, remotely, directly, or by implication attempts to withhold or in any wise curtail the right of the Legislature to prescribe rules and regulations for the admission of applicants to membership in the legal profession, or to limit the power and authority of courts to cancel and annul such privilege for sufficient cause by striking the name of the licensee from the roll of attorneys at law in appropriate proceedings for that purpose.

Surely, the Constitutional Convention, in prescribing that an officer subject to impeachment for proper

cause might also be prosecuted for a crime, notwithstanding he may have been impeached because of the commission of the same crime, intended thereby to say, by implication, that he, when also an attorney at law, and who was compelled to possess that qualification, could not have his license to practice revoked until after a successful impeachment proceedings was preferred against him. Yet the insistence of counsel is bottomed exclusively on that conclusion. Their reasoning loses sight of the only purpose, which we have above pointed out, that the Convention, and the people who adopted the Constitution, had in mind by the employment of the excerpt, supra, from section 68 of that instrument, and assumes that such express provision for prosecuting the officer for the commission of crime necessarily excluded all other proceedings for other derelictions that might consequentially result in loss or forfeiture of an office. The same fallacious conclusion would with equal logic apply if the officer committed and was convicted of murder, in which case either the punishment of death or imprisonment in the penitentiary would ipso facto terminate his tenure of the office he held, although the excerpt, supra, from our Constitution, while expressly authorizing the prosecution, does not expressly attach forfeiture of office as a part of the punishment.

In line with the Rowe Case is that of Underwood v. Commonwealth (Ky.) 105 S. W. 151, 32 Ky. Law Rep. 32; the respondent therein being the county attorney of Barren county at the time of the disbarment proceedings against him. In the Vermont case of Re Jones, supra, the respondent was at the time "State's Attorney for the county of Rutland," but the court did not allow that fact to interfere with or in any wise prevent it from proceeding with the disbarment proceeding preferred against him, and in disposing of that feature of the case it said: "Notwithstanding he might be liable to impeachment, or might be rejected by the voters if a candidate for relection, his conduct when acting in his office of attorney, and sometimes when acting in a private or other capacity, was open to investigation by this court; and if found to be such that the court, to protect itself and the public, and to keep the administration of justice pure, ought to withdraw the protection and credit under the law which it accorded him by admitting him to the office of an attorney at law and solicitor in chancery, it is, beyond question, the right and duty of

this court to deal with him as justice demands. It may suspend or disbar him.''

The same conclusion was reached by the Supreme Court of West Virginia in the Hays Case, supra, wherein the respondent was prosecuting attorney of Calhoun county in that state, and had accepted a bribe to not prosecute a violator of the law. During the course of the opinion the court said: ''No one will deny the power and duty of a court to strike from the roll the name of one who fails to maintain fidelity to the personal trust of a single client's interest. How much more important is the duty to exercise this power when the infidelity or misconduct relates to an attorney charged not only by the honor and oath of an attorney at the bar, but also by the dignity and oath of a public official, in an office calling for the exercise of highest qualities as an attorney! * * * It is impossible to say that what one does as prosecuting attorney is not done as an attorney. It is done in his professional relation to the people, as well as in his official relation. The office of prosecuting attorney is one of the exercise of the same professional attainments and fitness as pertain to a lawyer of private clientage only. As prosecuting attorney, he was acting in his character of an attorney nevertheless.''

The opinion then cites the domestic Underwood Case, supra, and the one of Ex parte Wall, 107 U. S. 265, 2 S. Ct. 569, 27 L. Ed. 552, together with others in support of its conclusion, and also in support of its additional and further conclusion, that ''The (disbarment) proceeding is in its nature civil, and collateral to any criminal prosecution by indictment.'' Also, it ''is not for the purpose of punishment, but for the purpose of preserving the courts of justice from the official ministration of persons unfit to practice in them.'' The final conclusion of the court was, that the mere fact that a respondent in a disbarment proceeding was also an officer subject to impeachment by the Legislature of the state wherein he held office, did not shield him from being proceeded against for the purpose of striking his name from the roll of attorneys. We therefore conclude that plea (b) is also unavailable.

The trial on the merits of the charges, as made by the response to the rule, was had before the court without the intervention of a jury (but which was not de-

mandable by either party. See 35 C. J. 186, sec. 80), and which was agreed to or acquiesced in by both parties litigant. After extensive testimony heard, the court found that none of the preferred charges were sustained, and dismissed the rule, thereby disregarding either of the technical defenses (a) and (b), supra, and from that judgment movants prosecute this appeal. It will therefore be seen that the two remaining questions for determination are: (1) Whether any one of the charges is sufficiently established by the evidence heard at the trial, and (2) If any one or more of them is established, does it (or they) contain such unfitness for the practice of law as to authorize a cancellation of respondent's license as a member of the legal profession? The answer to those questions requires a consideration of the testimony, as well as the applicable law.

Movants introduced no testimony in substantiation of two of the preferred charges because of the disappearance of witnesses, or for reasons best known to themselves. But they did introduce proof in substantiation of the other nine charges preferred against respondent, and which it is insisted by movants on this appeal fully sustained all of them; but since in six of them there was considerable contradictory testimony, and wherein a link in the proof necessary for conviction was supported only by the accusing witness and contradicted by respondent, we have concluded to put them aside and to make no further reference to them. A seventh charge was one accusing respondent of giving false testimony as a witness in a case, and which we think the great preponderating weight of the testimony sustains. But in the case of Beckner v. Commonwealth, 126 Ky. 318, 103 S. W. 378, 128 Am. St. Rep. 287, it was held that false testimony given by an attorney in a judicial proceeding did not constitute grounds of disbarment from practice, ''since he was absolutely privileged to the same extent as any other witness from any punishment except a criminal prosecution for perjury.'' The rule as so declared therein is by no means universally approved, since many courts hold that perjury or false swearing (which would subject the witness to a criminal prosecution therefor) exhibits such a low standard of morals and such a disregard for upright conduct as renders one unfit for membership in the legal profession, upon whom the law enjoins a strict observance of the highest degree of honor, uprightness, and

integrity, since the exclusive service in which a member of that profession engages is to assist courts in protecting individual rights, and rights of property, in accordance with the principles of justice based upon truth. Perjury or false swearing, therefore, exhibiting as it does such a wide departure from such a course, is held sufficient by the courts dissenting from the Beckner opinion to authorize and to sustain disbarment proceedings, and which they support with most persuasive and convincing reason and logic. But we do not feel called upon in this case to reconsider that opinion, or to even intimate the result, if done, since we are thoroughly convinced that at least two of the charges preferred against respondent were overwhelmingly proven, and that each of them involved such unfitness in him to practice law, or to engage in the activities of that profession, as to authorize his disbarment therefor, and to which we will now address ourselves, giving to those grounds our own designation of (x) and (y).

Charge (x) is bottomed on these facts: One Noah Mullins, a resident of Pike county, and who was past middle age and a man of considerable means, accused one Maude White, whose husband was living, of stealing from his person $7,000, which he said occurred in Pike county within respondent's jurisdiction as commonwealth's attorney. The accused woman denied the theft of the money, and on first approach she denied that she possessed it, but later admitted the latter fact and finally turned over the package containing the money to those who had procured a search warrant to search her person, and they delivered it to and deposited it in a bank in Pikeville, Ky. After that was done, the accused, Maude White, procured the services of Bowling & Creekmore, local attorneys, to procure the money for her because as she claimed it was hers, and which she insisted Mullins had given her. The evidence for movants disclosed that the alleged theft of the money became rapidly and extensively circulated in the community, and in some way respondent was informed of it. On the day he received such information Mullins was absent from Pikeville engaged in an effort to arrest the accused, who had left that city for some point in Virginia; Mullins having previously obtained a warrant for her arrest. While he was so engaged, respondent met his son and inquired of the latter as to the whereabouts of his father, stating to him at the time

that he wanted to see him as soon as he could. The son met the train that afternoon on which his father returned to Pikeville, and within a very short time they discovered respondent on the streets, who got into the automobile with father and son, and they drove about over the town for some considerable time. During the drive respondent told the father that he wanted to see him with reference to the theft matter, and intimated to him that there was a probability of, or that he had heard threats of, a prosecution of the father in the federal court for violating the federal statute commonly known as the Mann Act (18 USCA sec. 397 et seq.). Also, that there were rumors of a suit against him by the husband of Maude White, based upon alienation of the latter's affections, and which had then been, or was shortly thereafter, filed.

The next day Maude White and Mullins met in respondent's office, but before which Mullins had submitted all of the matters growing out of his escapade with Maude White to respondent for adjustment and settlement. Also, before that meeting, and following the one with Mullins on the day before (and above referred to), respondent accepted employment to assist Bowling & Creekmore in procuring for Maude White the $7,000. There is a dispute in the testimony as to how that employment was effected; but we do not regard the method as material. Bowling, an uncle of respondent, testified that he associated the latter with his firm, and stated, in substance, that he did so because the influence he had as prosecuting attorney would be of great aid in recovering the money for his client, Maude White. At any rate, at the meeting in respondent's office, a writing was prepared by him in which Maude White stated that nothing occurred between her and Mullins bringing their escapade within the provisions of the Mann Act, and Mullins agreed that Maude White had not stolen the money from him, and that he was willing for her to keep it.

Both parties then signed that writing, and at the same time they jointly signed a written order to the bank in which the money was deposited directing it to turn the deposit over to respondent. He immediately went to the bank and procured the money, and then went to the hotel where Maude White had rooms. She, Mullins, Bowling, and respondent were present, and the

latter delivered to Maude White all of the money ex<br>
ecpt $1,500, $500 of which he paid to Bowling for the<br>
fee of his firm, and retained for himself $1,000. In the<br>
meantime warrants had been obtained in the Pikeville<br>
police court accusing both Mullins and Maude White of<br>
the crime of adultery, and after the money had been<br>
obtained and distributed as indicated respondent ad-<br>
dressed a written request to the police judge to dismiss<br>
those prosecutions, and gave as a reason therefor, that<br>
"We want to get everything out of court as the trouble<br>
is all settled up."

The above is, in substance, what the testimony
shows to be the facts as to this charge, and which is
referred to in the record as the "Mullins charge." It
is true that respondent claims that he became convinced
that Maude White was not guilty of stealing the money
from Mullins, and that upon trial therefor she most
probably would be acquitted. She was arrested under
the warrant accusing her of the theft and was in the
custody of the law on that charge when the compromise
writing was prepared by respondent in his office, and
after he had been employed to assist Maude White to
retain the money. In doing so he managed to make
both contestants of the right to the money believe that
he represented each of them, and procured the arrange-
ment to be entered into as a result thereof. It will also
be noted that all of the solid time which he consumed
in recovering the money in the manner he did could not
possibly exceed only a few hours; but he charged there-
for a fee for himself alone twice as much as the pre-
viously employed firm of attorneys, consisting of two
members, charged for their services. Respondent
thereby clearly compromised a felony charge within his
jurisdiction as commonwealth's attorney, and accepted
a fee to recover for the alleged theft the money charged
to have been stolen by her; and we cannot accept his
only excuse therefor, i. e., that he became convinced of
her innocence.

It was his duty, both under his oath of office and
under his oath as an attorney at law, to prosecute the
case and to employ therein, not only the witnesses that
might be furnished to him by others, but such as he
could procure by reasonable investigation. If, however,
at the end of a good-faith investigation it should de-
velop that the prosecution was wholly unsubstantial he

might dismiss the prosecution for want of proof without incurring any sort of criticism. But that course was not pursued. On the contrary, a remuneration was accepted by him in consideration of discontinuing the investigation of the guilt of the alleged thief, as well as to further the defense of the other party to the transacion against a prospective white slave charge under the federal Mann Act. Under the law as it has been written by all courts, including this one, the outlined conduct of respondent furnishes ample grounds for his disbarment.

Charge (y) grows out of this state of facts: One T. M. Hunt had his will prepared by respondent, and in which he devised to Lena Ratliff the greater portion of his property. He afterwards married her, and which had the effect under our statute to revoke his will. After marriage he was convicted under a felony charge, but executed bond, and appealed from that judgment to this court. Pending that appeal he executed deeds conveying his real estate to his then wife, Lena Hunt, and shortly thereafter he was killed, which abated his appeal then pending in this court. His will was probated in the county court, but his only heir, George Hunt, appealed therefrom to the Pike circuit court; his counsel being Mr. E. J. Picklesimer, an honorable member of the Pikeville bar. Pending that appeal respondent approached Mr. Picklesimer and inquired of the latter upon what grounds he hoped to defeat the probate of the will, and was informed that our statute above referred to, as he concluded, revoked the will. They then discussed the deeds that T. M. Hunt had executed to his wife, and which at that time had been attacked by an equity action filed by George Hunt against the widow, seeking a cancellation thereof. Picklesimer in that conversation expressed some apprehension about succeeding in the attack so made by him for his client, when respondent informed him that he had in his possession a writing prepared by himself and signed by both T. M. Hunt and his wife, in which each of them acknowledged and stipulated that the deeds in contest only made the wife trustee for the husband during the period of his incarceration in the penitentiary, if his conviction was affirmed by this court.

Respondent then stated to Picklesimer that if the latter would divide his contingent fee of 50 per cent. of

the value of the property recovered for his client, George Hunt, that he, respondent, would produce and furnish the writing in his possession, and which was agreed to. In taking the evidence in the case of Hunt v. Hunt (but in the meantime Mrs. Hunt had married a Mr. McCloud), the only witness introduced for the plaintiff in that case was respondent, who produced and testified to the execution of the writing as he had agreed to do, in consideration of his employment in the case, and dividing the 50 per cent. conditional fee with Mr. Picklesimer. The court upon the trial of that case disregarded that writing and refused to cancel the attacked deeds as sought in that action; but upon appeal to this court that judgment was reversed in the case of Hunt v. McCloud, 231 Ky. 801, 22 S. W. (2d) 285, and the opinion directed the trial court to render a judgment canceling the attacked deeds, resulting in respondent recovering his fee. The record discloses without contradiction that the only service he rendered in that case was in the capacity of a witness in producing the writing that is set out in the Hunt v. McCloud Case, supra, and testifying to his having prepared it and witnessing its execution. In this charge, as in the other one (x), supra, there is some slight variation in the testimony as to some of the minor details; but the substance of the transaction, as we have outlined it, is virtually uncontradicted.

In the two cases of Chreste v. Commonwealth, 171 Ky. 77, 186 S. W. 919, 926, Ann. Cas. 1918E, 122, and 178 Ky. 311, 198 S. W. 929, one of the grounds upon which the respondent and appellant therein was arraigned and disbarred was the contractual disclosure of the testimony in his possession under conditions and circumstances almost exactly similar to what is contained in charge (y), with the possible exception that the guilty conduct of counsel was less culpable in that case than in this one. Yet we said in the first opinion, supra, and which was approved in the latter one, that "A resort to methods like this to secure employment exhibits such low ideals of the standards of honor prevailing in the profession that it may, as we think, be made the basis of a rule to show cause why the attorney guilty of it should not be punished for unprofessional conduct." In the second appeal of that case, reported in 178 Ky., supra, that charge had been found to be true by the jury to whom it was submitted, and

we held that it was sufficient, together with others likewise proven, to authorize a judgment permanently disbarring the attorney guilty of it.

In those two cases are cited many others from this court, among which is the one of Lenihan v. Commonwealth, 165 Ky. 93, 176 S. W. 948, 951, L. R. A. 1917B, 1132, in which there is a general statement of the law embracing conduct for which an attorney may be deprived of his license to practice, and which includes many acts that do not amount to an infraction of the criminal law. We take this excerpt therefrom: ''But the absence of a statute describing the causes for which an attorney may be disbarred does not prevent disbarment proceedings from being instituted or attorneys from being disbarred when they have been guilty of any personal or professional misconduct that shows them to be lacking in honesty, probity, and good demeanor, or unworthy to continue as officers of the court, charged with the duty of aiding in the correct administration of the law.''

The court in that opinion cites and quotes from the cases of Baker v. Commonwealth, 10 Bush, 592; Nelson v Commonwealth, 128 Ky. 779, 109 S. W. 337, 16 L. R. A. (N. S.) 272, and Commonwealth v. Roe, 129 Ky. 650, 112 S. W. 683, 19 L. R. A. (N. S.) 413, as completely sustaining the excerpt we have taken from the Lenihan opinion. Text-writers are to the same effect, and we do not understand counsel to contend that if their client is guilty of either one of the two charges, (x) and (y), which we have discussed, he would not be subject to be suspended from the practice.

We have not gone into details of the testimony of each witness and, of course, have refrained from discussing any of the preferred charges except the two (x) and (y), supra, since to have done so in detail as to each one, and to have attempted to reconcile the argued contradictions in the testimony, would have lengthened this opinion far beyond due limits, and with no corresponding benefit to any one. We have endeavored to point out the clearly established substance of the testimony upon which we base our conclusions in this opinion, and which we are convinced are fully borne out by the record. It necessarily follows that the court erred in dismissing the rule, and that it should have, at least, sustained the two charges we have discussed, and re-

voked the license of respondent to practice law because thereof.

Wherefore, the judgment is reversed, with directions to set it aside, and to render one in conformity with this opinion.