## Commonwealth ex rel. Wilson et al. v. Steele.

(Decided Jan. 19, 1934.)

WILLIS STATON for appellants.

W. A. DAUGHERTY, J. E. SANDERS and E. J. PICKLESIMER for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

This is a disbarment proceeding. The facts being submitted to a jury, they found the appellee not guilty of the misconduct charged. On a motion made before the judge who tried the case to enter a judgment of disbarment notwithstanding the verdict of the jury, he too refused to find the appellee guilty. From the judgment dismissing the proceedings, this appeal is prosecuted on the sole ground that the evidence warrants disbarment.

This case is an aftermath of the case of Commonwealth ex rel. Pike County Bar Association v. Stump, 247 Ky. 589, 57 S. W. (2d) 524, wherein O. A. Stump, then the commonwealth's attorney of the district of which Pike county forms a part, was disbarred from the practice of law in this state. The appellee at the time of the Stump disbarment proceedings had been president of the Pike County Bar Association for a number of years, and as such took a leading part in those proceedings which ultimately resulted in the disbarment of Stump. The record in this case satisfactorily discloses, and indeed Stump, who testified, does not deny it, that after Stump had been disbarred he made several visits to Frankfort to see one Conley who was serving a sentence in the penitentiary there under a conviction for the cutting of one Burnett, and procured Conley to make the affidavit upon which the information herein against the appellee was filed, and that thereafter Stump had at his expense gone to Frankfort and brought Conley to Pikeville for the purpose of testifying in this case. It further discloses that Stump had, after the institution of these proceedings, sent word to Steele that he would undertake to have them dismissed if Steele would get the bar association to reinstate Stump as a practicing lawyer. Of course, this was a matter that lay within the exclusive jurisdiction of the Court of Appeals.

The information filed against the appellee in substance charges that the appellee, a practicing lawyer of some 20 years' standing at the bar, was during the period covered by the information the attorney of Conley, who had been indicted in the Pike circuit court on two charges, one for the cutting of Burnett and the other for the murder of Susie Williams, the two offenses being interrelated. This last indictment was a joint indictment; one of Conley's codefendants being Woodie Stumbo. The information further charges that, for a consideration of $1,500 paid him by the relatives of Woodie Stumbo, the appellee agreed and did attempt to procure his client, Conley, to swear falsely on the trial of Woodie Stumbo by taking the blame, if any, for the killing of Susie Williams, and thus exonerating Stumbo. To substantiate these charges, the commonwealth relied, in the last analysis, on the testimony of Conley. Painting in the background against which that testimony stood out, we find that the commonwealth produced as witnesses among others one Stanley and the

relatives of Woodie Stumbo. The substance of their testimony is that Stanley, in behalf of the Stumbo family, visited the appellee, Steele, and told him that they had heard that he was representing Conley, who could and would give testimony favorable to Stumbo, and inquired of him what Conley knew and would testify. Steele replied that at that time he did not know, because he had simply represented Conley at his examining trial for the cutting of Burnett, and had waived examination on that hearing without securing from his client his version of what took place when Burnett was cut and Susie Williams killed. Appellee said, however, that he would interrogate Conley and then let Stanley know what Conley said. After the appellee had been to see Conley, there was a second interview with Stanley, at which some of the Stumbo family were present. In this interview, the appellee told Stanley and the Stumbos that he had seen his client, and that his client would say that, while he was fighting with Burnett, shielding his head from the blows of Burnett with one hand and striking at Burnett with a knife in the other, Susie Williams had run in between them; that he did not know whether he had struck Susie Williams or not, but, as she died from a knife wound, he probably did, but that, if he did strike her, it was without intention and was an accident, and done while he was trying to defend himself against Burnett. The Stumbos then said that, if Conley would "stand hitched" to this, they were willing to pay the fee of the appellee for defending him. Conley up to that time had been unable to arrange appellee's fee, and it was not certain that appellee would continue to represent him. It was agreed between the Stumbos and the appellee that the latter's fee should be $500, which was then paid him. They said that appellee was also told to tell Conley that, if he adhered to this story, the Stumbo family would pay his family, if Conley got any time for this or the Burnett charge, $1,000 to help them out while Conley was in the penitentiary.

Conley testified that the appellee came to see him in the jail and told him of the Stanley interview, and said that, if Conley would testify as the appellee later reported to the Stumbos he would, the Stumbos would pay the appellee's fee for defending him, and would assist him in getting a pardon, should he be convicted, and would pay his family $1,000. Conley further testi-

fied that he refused at first to agree to do what the appellee desired, telling the appellee that he had not stabbed Susie Williams, and that his fight with Burnett had taken place a number of feet away from the spot where Susie Williams was slain; but that on the appellee's insistence, and fearing the consequences of refusing to comply with the wishes of the powerful Stumbo family, he yielded, and told the appellee he would testify as the appellee wished him to do. The commonwealth further proved by Stump and the stepfather of Susie Williams that, when Woodie Stumbo's trial came on, Stump, then commonwealth's attorney, asked if he might interview Conley, who was then present in court looking to the use of him as a commonwealth's witness; that the appellee objected, and in the presence of the court stated what his client would testify to, it being substantially that which he had reported to Stanley and the Stumbos. At this Conley stepped over and whispered to a friend, and then blurted out that he would testify to no such facts, but would tell the truth, and that he was not implicated in the slaying of Susie Williams at all, but was some distance away from her at the time she was cut. Thereupon Stump dismissed the murder charge against Conley, and used him as a commonwealth's witness. The commonwealth did not produce the judge or the clerk of the court who were present when all this took place to corroborate Stump. Be that as it may, whether what happened in court was as Stump said or not, it is obvious in the light of the defense of the appellee, which we shall presently consider, that, had the appellee said anything during this court scene, he would have said just what Stump claims he did say.

For the defense, the appellee testified that, although he had represented Conley in his examining trial, Conley had been unable to arrange for his fee, and that he had dropped Conley's case without ever inquiring into, or being apprised of, the facts as Conley claimed them to be, that he only took Conley's case up again after Stanley visited him and because of Stanley's interest; that, when he went to see Conley, the latter was in a rage at the Stumbos because, as Conley then stated, the Stumbos had all gotten out on bond and left him to "rot in jail," and that he was very angry at them for not helping him; appellee then told Conley that the Stumbo family was a powerful family, and that, since there was little or no chance for him to get out of the Burnett

trouble, he had best not unduly make the Stumbos mad, for he would need their influence in the event he sought a pardon or parole in the Burnett trouble; that, after he had quieted Conley's anger, he then asked Conley how the Susie Williams' killing took place, requesting him to tell the truth about it; and that then for the first time Conley told him how the killing took place, stating just what the appellee later reported to Stanley and the Stumbos. The appellee further testified that he never had any part and knew nothing of the $1,000 promised Conley's family, but admitted receiving from the Stumbos the $500 fee for defending Conley. His version of what took place in court was that, when Stump sought to interview Conley, he (the appellee), simply objected to the interview or Conley being put upon the witness stand. The appellee introduced a number of witnesses from all walks of life to testify as to his good character. Conley's character was impeached, not only by virtue of his conviction for a felony, but also by the testimony of many witnesses who said that his reputation for truth and veracity was very bad.

We thus see that in the last analysis whether Conley told the appellee and the appellee believed in good faith the story the appellee related to the Stumbos and Stanley as to what Conley would testify, or whether in Conley's argot the appellee attempted ''to fix'' Conley's testimony, depends on whether one believes the appellee or Conley. The jury had to weigh the testimony of one whose character not only stood unimpeached but also was vouched for as of the best by men from all walks of life in the community against the testimony of a convicted felon whose character for truth and veracity was thoroughly impeached by those who knew him best. In addition to this was the evident spurring of Conley by Stump, whose animus was not only easily to be discerned but frankly confessed. In the light of all this, one should not be surprised that the jury and the trial judge found the appellee not guilty. In that finding we concur.

The judgment is affirmed.