**In re John J. STANTON, Respondent, A Member of the Bar of the District of Columbia Court of Appeals.**

No. 83–142.

District of Columbia Court of Appeals.

Submitted Sept. 15, 1983.

Decided Nov. 30, 1983.

Before NEWMAN, Chief Judge, and NEBEKER and MACK,* Associate Judges.

PER CURIAM:

This matter is before us for our consideration of the Report and Recommendation of the Board on Professional Responsibility.

The Board finds two separate acts of "neglect of a legal matter ...", 6 DR § 101(A)(3), and two separate instances of "intentional failure to seek a client's lawful objectives." 7 DR § 101(A)(1). The Board recommends suspension for a year and a day. We adopt the Board's recommendation.

Accordingly, it is ORDERED by the court that respondent John J. Stanton, be, and hereby is suspended for a year and a day from the practice of law for the reasons set forth in the appended Report and Recommendation of the Board on Professional Responsibility.

* *Associate Judge* MACK would adopt the sanction recommended by the Hearing Committee.

This order of suspension shall be effective thirty (30) days from the date of this opinion. D.C. Bar R. 11 § 19(3).

*So ordered.*

## BOARD ON PROFESSIONAL RESPONSIBILITY

## DISTRICT OF COLUMBIA COURT OF APPEALS

Bar Docket Nos. 31–81, 38–81

IN THE MATTER OF JOHN J. STANTON, RESPONDENT.

### REPORT AND RECOMMENDATION

Respondent was charged in two separate cases (No. 31–81 in which the complainant was Mr. Johnson) with neglecting a legal matter entrusted to him [DR 6–101(A)(3)] and intentional failure to seek a client's lawful objectives [DR 7–101(A)(1)]. In the *Johnson* case, respondent was also charged with conduct prejudicial to the administration of justice [DR 1–102(A)(5)]. These cases were consolidated for hearing, and the Hearing Committee found a violation of DR 6–101(A)(3) and DR 7–101(A)(1) in the case involving complainant Faison and a violation of only DR 6–101(A)(3) in the case involving complainant Johnson.

We adopt the Hearing Committee's findings of fact as set forth on pages 2–4 and 10–11 of its Report; they are amply supported by evidence of record. We also agree with the Committee's conclusion that respondent violated DR 6–101(A)(3) in both cases. However, while the Hearing Committee did not find a violation of DR 7–101(A)(1) in the *Johnson* case, we conclude that there were violations of DR 7–101(A)(1) in both cases.[1]

### FACTS

*Faison Case*

In June 1981 Mr. Faison was arrested on a felony charge. At this time there were already two misdemeanor charges pending against Faison, and shortly thereafter another misdemeanor bail-jumping charge was lodged against him for failure to appear at a hearing in one of the misdemeanor cases. Respondent was appointed as Faison's counsel in the felony case and in the misdemeanor bail-jumping case on June 13, 1981. On that day bond was set at $3,000 for both the felony and misdemeanor bail-jumping charges. A $5,000 bond had been set previously in each of the two pending misdemeanor cases. During the week of June 13, Faison twice requested respondent to file a bond review motion and in the ensuing three weeks made efforts to discuss his case with respondent. Respondent did not file such a motion and did not discuss the case with Faison.

At the urging of Faison's girlfriend, respondent made an unsuccessful attempt to reach Faison by telephone at the jail in late June. On June 25 Mr. Verrone, Faison's counsel in one of the misdemeanor cases, filed a bond review motion in which, among other things, he gave an explanation for Faison's failure to appear at the May 12 hearing which resulted in his bail-jumping charge. This motion was granted on July 1, and the bond was reduced to $2,500.[2]

On July 6, 1981, respondent conferred with Mr. Verrone about the status of the case that he was handling and the possibility of a plea bargain covering all three of the misdemeanor cases. This conversation and the attempted phone call to Faison at the jail were the only things done by respondent on behalf of Faison after the preliminary hearing in the felony case on June 19, 1981, until July 7, 1981.

On July 7 when Faison was in court for a status call in his misdemeanor cases, he talked to respondent and asked him to speak to the U.S. Attorney's Office about a plea bargain in the felony case. Respon-

---

1. In the *Johnson* case, the Committee found no violation of DR 1–102(A)(5), a conclusion with which we agree.

2. In September this bond was consolidated with the bond in Faison's other misdemeanor case, which was also reduced to $2,500.

dent did so at that time, but the Assistant U.S. Attorney was not prepared to make a plea agreement. When Faison and respondent met in the cellblock on July 7, Faison informed respondent that he had filed a complaint the previous day with Bar Counsel concerning respondent's failure to render assistance to him.

On July 14, 1981, Bar Counsel informed respondent by letter that he was in an adversary relationship with his client and should seek permission to withdraw. On July 18 respondent rejected Bar Counsel's request that he seek permission to withdraw.

Faison was arraigned on an indictment returned in the felony case on July 29; respondent was absent due to illness and another attorney represented Faison. The felony case was continued to August 27 for a status hearing. In the meantime Faison had filed *pro se* motions for bond review and for discovery.

There was no communication between Faison and respondent after July 7, except for a meeting in the courthouse cellblock on July 24 when Faison was there for a status conference on his misdemeanor cases. Respondent did nothing on Faison's behalf after July 7.

Sometime prior to the August 27 status hearing, the court removed respondent and appointed new counsel for Faison.

### Johnson Case

Mr. Johnson was arrested on October 2, 1980, on a warrant charging petty larceny. As a result of a search conducted at the time of the petty larceny arrest, he was also charged with violation of the Dangerous Drug Act.[3] On that same day respondent was appointed to represent Johnson in both of these cases.

At a preliminary hearing on the drug case on October 30, 1980, the prosecutor offered to drop one of the two charges against Johnson if he would enter a guilty plea to the other. On respondent's advice, the offer was declined. Both cases were assigned to Judge Hess who set the petty larceny case for trial on May 28 and the drug case for trial on June 4, 1981.

Respondent was not present when the larceny case was called for trial on May 28 because of his attendance in another courtroom. Based on mistaken information as to the reason for respondent's absence, Judge Hess removed respondent from the larceny case and appointed attorney Jankovich to represent Johnson in the larceny case which was continued.

The drug case came on for trial on June 4, 1981. After the jury had been impanelled, Johnson sought to enter a plea of guilty. During Johnson's attempt to plead guilty, respondent limited himself to urging Johnson to tell the court what it was that Johnson wanted. Other than responding to the court's inquiry concerning how much investigation respondent had performed, respondent said nothing to the court in aid of Johnson's attempted plea and, so far as the record shows, said nothing to Johnson except to urge Johnson to tell the court what was on his mind.

The judge declined to accept Johnson's plea on account of Johnson's apparent confusion, and the case went to trial, which resulted in Johnson's being found guilty. At the conclusion of the trial, Judge Hess removed respondent as counsel for Johnson and, on June 24, 1981, vacated the jury verdict.

Johnson was committed to jail at the conclusion of the trial. Later, Johnson did plead guilty in the larceny case, and the drug case was dropped. Johnson was then sentenced to sixty days with credit being given for the time already served. Since the time Johnson had served by then exceeded sixty days, Johnson was released at the time of his sentencing.

---

**3.** He was also charged with possession of implements of crime, but this charge was evidently dropped early in the process.

## DISCUSSION

Our review of the extensive record in this case leaves us with no doubt that respondent neglected the legal matters of Johnson and Faison that were entrusted to him and that, in several instances, he willfully failed to pursue the lawful objectives of his two clients. The record in this case is highly detailed, and respondent contests almost none of the facts recited above. The Hearing Committee's meticulous report sets forth its findings of fact and carefully ties them to the record.

Those facts show that in the *Faison* case respondent failed to file a bond review motion when requested to do so by his client; failed to communicate in any significant fashion with his client; failed to investigate the facts of his client's case. Like the Hearing Committee, we do not reach the question whether any one of these failures by itself would amount to a violation of the disciplinary rules. Our unequivocal conclusion is that the sum total of all of these failures violates both DR 6–101(A)(3) (neglect) and DR 7–101(A)(1) (intentional failure to seek lawful objectives).

Turning first to the bond review motion, as we pointed out in *In re Rosen,* Bar Docket Nos. 347–80, *et al.,* decided April 28, 1982, now pending in the District of Columbia Court of Appeals, there may be certain extreme situations in which a bond review motion is utterly futile. In our view, those situations are limited to ones in which there is no possibility of release.

Faison found himself in a far different situation. There is no question that securing Faison's release, given the fact that he was subject to three separate bonds, would have been a difficult undertaking indeed. However, so far as we are aware a lawyer is not excused from performing legitimate tasks on behalf of his client simply because of their difficulty. The truth is that much could have been, and was subsequently done by other counsel, to reduce Faison's bond. That being the case, the precious right of respondent's client to secure his freedom before trial should not have been so lightly put aside by respondent.

There is no doubt in this record that the client requested that a bond review motion be filed. Therefore, respondent's refusal to carry out his client's lawful objective smacks of the kind of intentional conduct that is prohibited by DR 7–101(A)(1).

We think that the Hearing Committee also correctly analyzed the question whether respondent should have made a visit to the jail to discuss the case with his client. Although as individual lawyers, members of the Board might reach a different conclusion considering respondent's blanket refusal to interview his clients in the jail, that decision seems to us within the range of possible judgments that a lawyer could reasonably make concerning how to communicate with his clients.

However, the total absence of any meaningful discussion of this case with the client in any context or in any setting casts the entire matter in a different light. Thus, we find that even if we accept respondent's judgment in the matter of visiting the jail, we are bound to condemn his failure to find some alternative means of talking with his client about the case somewhere else.

Respondent himself admitted that the government's case against Faison was speculative in nature. Nevertheless, respondent made no effort to locate any witnesses helpful to Faison who could have bolstered his case. Respondent compounded the seriousness of his inactivity by refusing to withdraw as Faison's lawyer when notified by Bar Counsel of Faison's complaint against him. To compound matters, respondent refused to take any further action on behalf of Faison after the complaint was filed by Faison. Respondent sought no informal discovery from the prosecutor, initiated no plea negotiations, undertook no investigation, and did not speak to his client except for a brief courthouse cellblock visit when Faison was in court in connection with another case.

On the whole record in the *Faison* case, we concur in the Hearing Committee's find-

ing that respondent violated the rules as charged.

The *Johnson* case presents a different, but equally disturbing, set of facts. Johnson had a hopeless case on the drug charge. Johnson had repeatedly told respondent that he was guilty of the charge. Johnson had signed a confession that was not subject to suppression. There were no search and seizure questions concerning the manner in which the police found the drugs in Johnson's possession. There was no affirmative defense. Respondent himself acknowledged that a guilty verdict was a virtual certainty.

In the face of all this, respondent counselled Johnson against entering a plea, instead urging Johnson to exercise his constitutional right to put the government to its burden. We wish to state that, whether or not individual members of this Board might or might not have adopted the same strategic approach to Johnson's case, respondent's advice to Johnson in this matter is not the subject of our concern.

Respondent claims that he had a theory of Johnson's case. Johnson had been on probation at the time of his arrest on the drug charge and had not been reporting regularly to his probation officer. Respondent says he believed that Johnson's release on bond could be obtained and that Johnson could, while on bond, compile a record of reporting to the probation officer that would assist Johnson at his virtually inevitable sentencing on the drug charge. We express no opinion as to the soundness of respondent's approach in this regard since it is not our function to assess the relative merits or demerits of reasoned tactical choices made by diligent counsel.

However, even accepting respondent's view of the case, once the trial date of June 4, 1981, came around, there was not further advantage for his client in pursuing the strategy of delay. At that point, Johnson clearly wanted to plead guilty. He had repeatedly expressed to respondent his desire to do so. Nothing further could be gained for Johnson by refusing to do so.

Nevertheless, in direct contravention of his client's often-repeated desire to plead guilty, respondent refused in open court to take any affirmative action to further his client's desires in the matter.

The transcript of the colloquy between Judge Hess, Johnson, and respondent at the opening of the trial makes clear beyond doubt that respondent stubbornly refused to give his client even minimal assistance in entering his plea. Johnson sought the court's attention and said that he wanted to plead guilty. The judge began a standard Rule 11 voir dire to determine the voluntariness of the plea. Johnson indicated confusion about one point. He was confused as to why his drug charge and his petty larceny case had not been consolidated since the drugs had been seized from his person at the time that he was arrested on a warrant on the petty larceny case.

Johnson's confusion could have been cleared up in a moment or two had respondent offered his client any advice or guidance. Far from offering advice and guidance to the client in order to assist him in achieving his lawful objective, respondent said nothing to his client beyond several times urging him to tell the judge what was on his mind. This conduct falls so far below the standard expected of attorneys in assisting their clients that we have not the slightest hesitation in condemning it as neglect and as a wilful failure to pursue the client's lawful objectives.

Respondent's conduct embodies a view of the lawyer's role that we simply cannot accept. Respondent's view seems to be that in a case of disagreement between respondent and his client over the proper course of action to follow, the client is on his own in attempting to follow any course not concurred in by respondent. We think it is clear that, at least as to the fundamental decisions concerning the client's case, it is the respondent's desires, so long as they are lawful, that must control.

Respondent owes his clients an obligation to pursue their objectives as they see them.

Naturally, we would defend to the fullest respondent's right, and indeed his duty, to communicate to his client his own views. However, once respondent is satisfied that his client is competent to make decisions concerning fundamental matters such as whether to plead guilty, once respondent is satisfied that the client understands the advice that he is giving, and once respondent is satisfied that the client's choice in the matter is a lawful choice, then respondent, in our view, owes his client a legal duty to use his best efforts to pursue the client's stated objective. He may not substitute his own judgment for that of the client, and he may not, as he did in the case of Johnson's plea of guilty, stand passively by while his client flounders in an attempt to achieve a perfectly reasonable goal.

We reject respondent's attempt to characterize the position set forth in the preceding paragraph as a substitution by this Board of its judgment for that of respondent. Any fair reading of the record will show that the Hearing Committee went to considerable lengths to make sure that it was not in any way substituting its judgment for that of respondent. We have tried to emulate the Hearing Committee in this regard. Nevertheless, the fact remains that there are certain bounds prescribing ethical conduct in our profession, and respondent's "judgment" cannot be used as a license to roam beyond those bounds. We find that in the *Faison* and *Johnson* cases, respondent has done so.

We are troubled by one aspect of the Hearing Committee's report. In the *Johnson* case, the Hearing Committee notes in a single, unexplained sentence at pages 11–12 that the Hearing Committee did "not find a violation of DR 7–101(A)(1) (intentional failure to seek a client's lawful objective) or DR 1–102(A)(5) (conduct prejudicial to the administration of justice)."

Later in its report, the Hearing Committee returns to the subject of conduct prejudicial to the administration of justice. The Hearing Committee explains at pages 15–16 that it does not view respondent's conduct of the trial in the *Johnson* case to amount to conduct prejudicial to the administration of justice. While respondent may have walked very close to the line, and indeed occasionally even have wandered over it, in disregarding various rulings by the court during the trial in the drug case, we do not hesitate in agreeing with the Hearing Committee that the conduct contained in this record is not a violation of the disciplinary rules. The truth is that in the fray of heated litigation, it may often be the lawyer's duty to press to the limits of the court's rulings. In doing so, counsel may occasionally and inadvertently wander across the line. Except in extreme circumstances which demonstrate a conscious, deliberate, and repeated pattern of transgressing the court's rulings, we would be very loathe to engage in *post hoc* analysis of counsel's judgment in this regard.

However, in its report the Hearing Committee never does return to the subject of why respondent's conduct in the *Johnson* case does not amount to a violation of DR 7–101(A)(1) (intentional failure to seek lawful objectives). Therefore, we have engaged in our own independent analysis of the record and find that such a violation has been clearly made out. When, at Johnson's sentencing, respondent refused to assist Johnson in entering his plea, he made a deliberate and conscious choice not to pursue the objective that his client wanted him to pursue. The conduct is not the type of inadvertent or unconscious conduct that is embraced by the disciplinary rule prohibiting neglect. It goes beyond neglect and rises to the level of conduct condemned by the disciplinary rule that prohibits intentional failures to pursue the client's objective. We therefore disagree with the Hearing Committee's report in this one regard and recommend to the court that respondent be found in violation of DR 7–101(A)(1).

## SANCTION

The Hearing Committee conducted a separate proceeding on the issue of sanction

and had before it briefs from Bar Counsel recommending suspension of a year and a day and respondent's brief, which did not address the issue of sanction but in effect asked the Committee to reconsider its decision on the violation. In a separate report and recommendation on the issue of discipline the Committee, after careful consideration, rejected Bar Counsel's proposed discipline and recommended instead that respondent be suspended from practice for 120 days. In addition, the Committee recommended that, if subsequent procedural developments made it possible, respondent's suspension in the present case as well as in his prior case (*In re Stanton,* Bar Docket Nos. 180–79, *et al.*) total no more than 120 days.

After much consideration, we cannot agree with the Hearing Committee's recommendation in this regard. Although we are always reluctant to overrule our hearing committees and particularly so where the hearing committee has done an extensive and thoughtful job of analyzing the case, as here, we are moved by different considerations in recommending a sanction to the court in this case.

The focus of our analysis is on the respondent himself. Although this Board has an undoubted duty to maintain consistency in its recommended sanctions, a matter to which we turn in a moment, we feel that the unusual circumstances of respondent's position mandate that we begin our inquiry by focusing on his particular situation.

With the publication of the report and recommendation of the Board in this case, respondent will be before the court on two separate cases involving a total of four clients. Upon consideration of all four matters together, we think that a pattern emerges in respondent's conduct that is most disturbing.

First, respondent arrogates to himself the role of decision-maker in his representation of his clients. Although, as we have said so many times in our two opinions in these cases, there are areas in which counsel's judgment should prevail, respondent's peculiar view of his duty to his clients means to him that his judgment should prevail over that of the client in the substantive areas traditionally reserved solely to the client. There is no question that the decision whether to plead guilty, as in the *Johnson* case, is committed to the client and not to the lawyer. Nevertheless, respondent feels that he is entitled actively to attempt to thwart his client's desires as in the *Wilson* case discussed in our previous report and recommendation or to stand by and allow his client to flounder without his assistance as in the *Johnson* case discussed herein.

Second, respondent's habit of keeping his clients largely in the dark about the progress of their cases is deplorable. The ABA's Minimum Standards for the Defense Function make it clear that full and complete communication with the client is an essential part of the attorney's role. Whether or not respondent cares to visit the D.C. jail to communicate with his clients is immaterial. If he chooses not to visit his clients at the jail, then he has the responsibility to devise some other means of keeping them posted as to developments in their cases.

Third, although not the basis for any disciplinary violation in this case, we think that respondent's arrogant and abusive manner towards his clients is relevant to the issue of sanction. The record in this and in the prior case is now replete with instances in which respondent admits that he verbally abused his client or a member of the client's family. We find his foul-mouthed conduct in this regard to be starkly unprofessional and symptomatic of contempt, even almost a feeling of anger, that respondent seems to hold routinely towards his clients.

We are not unmindful of the difficulties of serving as appointed counsel for indigent criminal defendants. This Board tries to remember that charges are easy to make and difficult to defend. Nevertheless, out of the fabric of respondent's practice, there emerges a pattern of contempt for his clients that we find deeply disturbing.

Fourth, we are impressed by the fact that respondent does not seem to have the slightest doubt about the correctness of his behavior in routinely overruling his clients' judgments. In his arguments in the various hearing committees before which he has appeared and in this Board and in the papers he has filed, respondent has taken an extreme position: namely, that he is entitled to exercise his professional judgment in almost every situation regardless of the views of his client.

The result of this extreme view is particularly harsh where respondent does not communicate fully or well with his clients. In these situations, the client has little or no opportunity to make his views known, and when he does, his judgment is overruled by his attorney.

The cumulative effect of respondent's approach to his practice falls especially heavily upon respondent's clients because they do not choose to be his clients. Respondent's practice consists largely of appointed criminal cases. His clients have little or no choice as to who will represent them. In that situation, it seems to us that respondent has a particular obligation not to run roughshod over his client's views because they do not have available to them the protective mechanism that the client of the retained lawyer does: that is, simply to change lawyers.

We turn now to a consideration of other like cases and similar sanctions. As always, the job of drawing bright lines through the previous decisions of this Board and of the court in cases concerning neglect and wilful failure to pursue lawful objectives is a task fraught with difficulty. Nevertheless, we believe that certain broad patterns can fairly be discerned. At the lower end of the scale, the sanctions of reprimand by this Board and censure by the court have been reserved, for the most part, for single cases of neglect. *In re Williams,* Bar Docket No. 147–77; *In re Roundtree,* Disciplinary No. 31–76; *In re Rosenthal,* Bar Docket No. 118–77; *In re Mailloux,* Bar Docket No. 66–79; and ·*In re Hyman,* Bar Docket No. 69–79, are all cases involving simple neglect without more, all of which resulted in public reprimands. *But see In re Menard,* Bar Docket No. 278–78 (also involved violations of DR 1–102(A)(5) and 7–101(A)(1)(2) resulting in reprimand); *In re Mundle,* Bar Docket No. 442–77 (involved violations of the same additional rules also resulting in public reprimand). *In re Brown,* Bar Docket Nos. 305–77, *et al.; In re Guhring,* Bar Docket No. 398–78; *In re Mizel,* Bar Docket No. 77–74, all also involve simple neglect in violation of DR 6–101(A)(3) and resulted in public censures. *But see In re Hughes,* Bar Docket No. 455–78 (also involving violations of DR 5–105(A) and DR 7–101(A)(1) and (2) resulting in public censure).

At the other end of the scale, the sanctions of disbarment or suspensions of two years or more have been, by and large, limited to those cases involving an extremely broad pattern of neglect and/or wilful failure [4], usually joined with other disciplinary violations and/or a record of previous disciplinary violations, indicating a general unfitness to practice law. *In re Haupt,* 444 A.2d 317 (D.C.C.A.1982) (twelve counts of neglect together with violations of numerous other disciplinary rules and prior record); *In re Spencer,* Bar Docket Nos. 222–79, *et al.* (eight counts); *In re Walsh,* Bar Docket Nos. 198–77, *et al.* (six counts); *In re Kops,* Bar Docket No. 211–77 (allowed legal clinic to collapse leaving at least four clients without representation resulting in two-year suspension).

Disbarment and lengthy suspensions have also resulted where gross negligence and wilful failure are combined with an extensive prior disciplinary record. *In re Bush,* Bar Docket No. 101–78 (gross negligence plus prior censure, two prior admonitions, and one prior reprimand resulted in disbarment); *In re Carter,* Bar Docket Nos. 170–77, *et al.* (gross negligence in two cases plus two prior suspensions resulted in disbar-

---

**4.** We use wilful failure as a shorthand reference to the wilful failure to pursue the client's lawful objectives prohibited by DR 7–101(A)(1).

ment); *In re Thorup* (neglect in criminal case joined with prior discipline and failure to cooperate with Bar Counsel resulted in recommendation of two-year suspension now pending in D.C.C.A.). Also, serious neglect and/or wilful failure combined with an act of dishonesty and/or prior discipline has also resulted in disbarment or a lengthy suspension. *In re Deusterdick,* D.C.C.A. No. D–9–75 (1975) (neglect leading to expiration of statute of limitations joined with false statements concerning status of claim resulted in disbarment); *In re Sawyer,* Bar Docket Nos. 117–76, *et al.* (neglected to file two cases and subsequent misrepresentation concerning status and outcomes of cases resulted in disbarment by consent); *In re Williams,* Bar Docket Nos. 206–78, *et al.* (pattern of neglect plus commingling resulted in Board recommendation of disbarment now pending in D.C.C.A.); *In re Haupt,* 422 A.2d 768 (D.C.C.A.1980) (four counts of neglect joined with conversion of client funds resulted in three-year suspension).

However, when we turn to suspensions in the range of sixty days to a year and a day, the waters become considerably murkier. The cases involving suspensions for a year and a day include *In re Bush,* Bar Docket Nos. 63–77, *et al.* (two cases of neglect joined with presentation of false evidence to hearing committee and record of prior censure); *In re Fogel,* 422 A.2d 966 (D.C.C.A.1980) (neglect joined with false excuses to the court and previous reprimand for neglect); *In re Smith,* Bar Docket Nos. 370–77, *et al.* (numerous cases joined with failure to honor agreement with Bar Counsel). *Bush, Fogel,* and *Smith,* like the present case, all involved conduct that was wilful as well as neglectful. *In re Tucker,* Bar Docket No. 155–76, involved a single act of neglect joined with conduct involving dishonesty in the conversion of funds from an estate. The sanction of one year and one day suspension was apparently tailored to fit the Board's and the Court's concern that respondent's failing mental and physical condition made it unlikely that she would be able to resume the practice of law in the future. Therefore, a suspension of a

year and a day was thought appropriate in order to shift the onus to respondent of justifying any possible future readmission to the Bar.

Cases involving suspensions of six months include *In re Lieber,* Bar Docket Nos. 384–78, *et al.* (neglect joined with failure to honor promises to Bar Counsel); *In re Ramos,* Bar Docket Nos. 548–78, *et al.* (neglect and wilful failure resulting in expiration of statute of limitations and failure to respond to court's request for additional evidence); *In re Russell,* 424 A.2d 1087 (D.C.C.A.1980) (wilful failure to pursue personal injury case joined with failure to turn over file to new counsel and failure to cooperate with Bar Counsel); *In re Whitlock,* 441 A.2d 989 (D.C.C.A.1982) (neglect and wilful failure in two criminal appeals made out pattern of conduct but mitigating factors present); and *In re Roundtree,* Bar Docket No. 432–77, *et al.* (four cases of neglect and wilful failure including prior disciplinary record for neglect resulted in Board recommendation of six-month suspension now pending in D.C.C.A.).

Before turning to the cases involving suspension of three months, we note that *In re Cope,* 455 A.2d 1357 (D.C.C.A.1983), the court held that respondent's conduct in neglecting two criminal appeals was "less aggravated than had been the conduct of the attorney in *Whitlock, supra,* who was suspended for six months."

The cases involving suspensions of three months include *In re Alexander,* Bar Docket Nos. 179–80, *et al.* (respondent, who neglected to appear for scheduled trial in one case and sent unprepared associate to hearing in another, had three prior informal admonitions; case resulted in Board recommendation of suspension of three months now pending in D.C.C.A.); *In re Dwyer,* Bar Docket Nos. 356–78, *et al.* (respondent neglected to appear three times in one case and wilfully violated client's instructions in another); *In re Harmon,* Bar Docket No. 350–79 (neglect and wilful failure in not filing suit and failure to honor promise to

Bar Counsel); *In re Jamison,* Bar Docket No. 5–78 (neglect and wilful failure to file answer on time and appeared in court late after three prior informal admonitions); *In re Knox,* Bar Docket No. 414–78 (neglect and wilful failure leading to expiration of statute of limitations after three prior informal admonitions); *In re Rosen,* Bar Docket Nos. 347–80, *et al.* (neglect and wilful failure to move for pretrial release, failure to communicate with client, and failure to conduct investigation in two cases after record of prior discipline).

Finally, in respondent Stanton's previous case before this Board involving similar conduct in two other appointed criminal cases, the Board recommended a suspension of sixty days. That recommendation is now pending in the District of Columbia Court of Appeals.

As we survey this panoply of cases, we conclude that within the range of suspension from sixty days to a year and a day, the cases do not admit of easy classification. The sanctions that this Board has recommended, and that the court has adopted, in various neglect and wilful failure cases within the range we are now discussing seemed particularly sensitive to the facts and circumstances of each individual case.

In this case, given the deep concerns that we have about respondent's failure to grasp his ethical obligations to represent his clients in accordance with their legitimate wishes, we cannot escape the conclusion that respondent is drifting towards a disastrous disciplinary situation. Therefore, we find that a suspension of a year and a day is appropriate in this case in order to give respondent an opportunity to reflect upon his ethical obligations and to force respondent to justify his readmission to active practice.

The facts in respondent's four cases are unusual. Respondent has not been guilty of neglect in the usual sense of inadvertence or unconscious inattention. Instead, he seems to have a cohesive, although in our view completely erroneous view of his role as a lawyer. That view entitles respondent, in his judgment, freely to overrule his clients' wishes. Given the intractability of respondent's views in this regard, we think that the sanction recommended—a suspension of a year and a day—is the appropriate one.

BOARD ON PROFESSIONAL
RESPONSIBILITY
By: /s/ Mark W. Foster
    MARK W. FOSTER

Date: 2/15/83

All members of the Board except Mr. Webb participated in the decision of this case.