**In the Matter of Richard B. SABLOW-SKY, A Member of the Bar of the District of Columbia Court of Appeals.**

No. 85–1649.

District of Columbia Court of Appeals.

Argued June 11, 1986.
Decided July 29, 1987.

Wallace E. Shipp, Jr., Asst. Bar Counsel, with whom Thomas H. Henderson, Jr., Bar Counsel, Washington, D.C., was on the brief, for the Bd. on Professional Responsibility.

Charles R. Work, with whom Michael D. Esch, Washington, D.C., was on the brief, for respondent.

Before NEBEKER, FERREN, and ROGERS, Associate Judges.

FERREN, Associate Judge:

In this disciplinary proceeding, Richard Sablowsky is charged with violating Disciplinary Rule 1–102 (A) (5) by engaging in conduct "prejudicial to the administration of justice." The Board on Professional Responsibility agreed with the Hearing Committee that Sablowsky had used improper means—withholding a witness' name—to induce plaintiff's counsel in a medical malpractice action to retain Sablowsky as an expert medical-legal consultant. Rejecting the Hearing Committee's suggested sanctions of a public reprimand, the Board has recommended a six month suspension from the practice of law (with one member dissenting in favor of a reprimand or censure). Because we unanimously agree that Sablowsky violated DR 1–102(A)(5) and that the Board's proposed sanction is correct, we order that Sablowsky be suspended for six months from the practice of law in the District of Columbia.

## I.

The allegations of misconduct are attributable to negotiations between Sablowsky and two other attorneys, John P. Hills and Bruce L. Marcus, who were pursuing a medical malpractice action for a client named O'Laughlin.

### A.

In October 1982, Sablowsky met with Eileen O'Hara, a Certified Registered Nurse Anesthetist (CRNA), to discuss the possibility of her serving as an expert witness in another case. During this discussion, O'Hara mentioned the O'Laughlin litigation; she had been present in the operating room during O'Laughlin's surgery. According to Sablowsky, O'Hara told him she was receiving pressure from hospital administrators and defense counsel to adopt the hospital's version of the facts—a version with which she strongly disagreed. He added that O'Hara had wanted to contact plaintiff's counsel but that she had been concerned about jeopardizing her employment at the hospital. Sablowsky suggested she write to her supervisor, setting out her version of the facts, in order to create a record that would protect her against an unjustified discharge. Sablowsky further testified that O'Hara had asked him to contact plaintiff's counsel for her but not to reveal her name until after she had sent the letter to her employer.

Sablowsky soon telephoned Hills. He said that he was a medical malpractice consultant, that he had some information about the O'Laughlin case, and that he would like to talk about the services he could offer. Hills agreed to meet with Sablowsky and asked to include his cocounsel, Marcus.

On October 25, 1982, Sablowsky met with the two attorneys and described O'Hara's situation without giving her name, sex, or exact professional position. He described the witness as a "health care professional" in "anaesthesiology support." He said the witness' account of the O'Laughlin operation would provide a stronger theory of liability than the approaches counsel were considering at that time, but he did not elaborate on the alternative theory or on the facts underlying it. Sablowsky also mentioned that another eyewitness could give the same account, but he did not give the name or position of this witness. In addition, Sablowsky described his credentials as a medical-legal consultant and suggested that his services would be useful to them. Hills rejected Sablowsky's initial proposal that he receive a percentage of the recovery for his services. Sablowsky then proposed a fee of $25,-000, contingent on successful resolution of the case. The meeting ended inconclusively. Hill and Marcus left the meeting with the belief that Sablowsky was trying to sell them the witness' name in exchange for a consulting job or, at least, for money disguised as a consulting fee.

### B.

Shortly after this first meeting, Hills contacted former Bar Counsel about his concern that Sablowsky's actions might comprise an unethical effort to sell evidence. In a letter to Bar Counsel, Hills outlined his recollection of the October 25 meeting and stated that he would prefer to confront Sablowsky with the fact that he had consulted Bar Counsel. Bar Counsel, however, favored Hills' proposed alternative approach: continuing the "negotiations" to see what Sablowsky would do. In a meeting with Hills on October 27, 1982, Bar Counsel "deputized" Hills and Marcus as "affiliate[s] of [his] office" to investigate Sablowsky and to keep Bar Counsel apprised of further developments. According to the Board's report to this court, Bar Counsel thus "encouraged Mr. Hills to continue negotiations with Respondent and to explore fully the ethical implications of his conduct." On November 3, 1982, Hills telephoned Sablowsky and voiced his concern that their negotiations might create the "appearance of buying evidence." Sablowsky replied that Hills would be buying consulting services, not evidence. Further meetings followed. Hills testified that "[e]verything from the November 3 conversation on was pursuant to Bar authority, and were negotiations I would not have entered into but for the fact of Bar authority."

### II.

In ruling that Sablowsky violated DR 1–102(A)(5), the Board purported not to rely on Hills' and Marcus' respective accounts of contract negotiations that oc-

curred after the first part of the November 3 telephone conversation. The Board was properly concerned, as was the Hearing Committee, that Bar Counsel's "deputizing" of Hills and Marcus violated this court's rules and thus tainted their later encounters with Sablowsky.[1] Unfortunately, however, the Board's Report and Recommendation reveals that the Board did rely on significant events that occurred during a meeting on November 5, 1982, and in a later telephone call.[2]

A majority of the division agrees with the Board that Bar Counsel violated D.C. Bar R. XI § 4(3)(b), *supra* note 1, by encouraging the two attorneys on October 27 to continue to negotiate with Sablowsky in order to determine whether the situation would unfold into a more clear-cut violation. In my view, the actions of Bar Counsel, through Hills and Marcus, amounted to an improper effort to lure Sablowsky into more obvious unethical behavior. Bar Counsel has a responsibility to educate the bar with the hope of preventing violations, if possible, not of encouraging them. Bar Counsel, therefore, should have alerted Sablowsky to his concerns, based on Sablowsky's correspondence and meeting with Hills. Bar counsel thus would have afforded Sablowsky an opportunity to pursue his relationship with Hills ethically or not at all.[3]

### III.

■ Because the Board relied in part on evidence created after Bar Counsel had deputized Hills and Marcus, and because we generally treat recommendations of the Board like actions of administrative agencies for purposes of our review, this court ordinarily would remand the case for reconsideration. *In re Dwyer*, 399 A.2d 1, 12 (D.C.1979) (citing *Securities & Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943)); *In re Thorup*, 432 A.2d 1221, 1226 (D.C.1981). In this case, however, the Board's consideration of events after the October 25 meeting was not prejudicial. On review of agency adjudications, "reversal and remand is required only if substantial doubt exists [as to] whether the agency would have made the same ultimate finding [without the questionable evidence]." *Arthur v. District of Columbia Nurses' Examining Bd.*, 459 A.2d 141, 146 (D.C.1983) (citing *Liberty v. District of Columbia Police & Firemen's Retirement & Relief Bd.*, 410 A.2d 191, 194 (D.C.1979)). Limiting ourselves to events that occurred before the deputization of Hills and Marcus on October 27, we conclude the Board would still have found by "clear and convincing evidence" that Sablowsky violated a disciplinary rule.[4] The Board's references to events after October 25, *supra* note 2, were "demonstrably subsidiary" to its re-

1. Under Rule XI, only the Board can appoint assistant Bar Counsel or designate or "deputize" lawyers to serve as special representatives of the Board. D.C.Bar.R. XI § 4(3)(b) provides:
    (3) The Board shall have the power and duty:
        \*     \*     \*     \*     \*     \*
    (b) To appoint Bar Counsel and such assistant bar counsel and staff as may from time to time be required properly to perform its functions hereinafter prescribed and fix their compensation. (Bar Counsel and assistant bar counsel hereinafter are referred to collectively as Bar Counsel.)

2. The Board states that the "earlier evidence"—that is, earlier than the first part of the November 3 phone call—"establishes that Respondent demanded [an] initial $1,500 payment and expected [a] second installment to be made only after [Hills] obtained the name of the witness and met with her." In fact, these events occurred during the November 5 meeting. The

Board then states that the record showed Sablowsky had threatened to tell the O'Laughlin defense attorneys that Hills and Marcus had tried to buy evidence, unless Hills would hire him. In fact, however, Hills testified that Sablowsky had made this threat sometime after November 24.

3. My concern that Bar Counsel practice "preventive law" would not have precluded his informally admonishing Sablowsky, D.C.Bar.R. XI § 3(6), or pursuing a more severe sanction based on information available as of October 27, provided, of course, that all procedural protections were followed. Bar Counsel, however, has discretion to take educative or preventive measures in lieu of disciplinary action when circumstances warrant.

4. Bar Counsel has the burden of proving violations of disciplinary rules by "clear and convincing evidence." Board Rule 1.4.

liance on the evidence attributable to the October 25 meeting. *Liberty*, 410 A.2d at 194 (quoting *Braniff Airways, Inc. v. C.A.B.*, 126 U.S.App.D.C. 399, 412, 379 F.2d 453, 466 (1967)).

We turn now to the evidence. Sablowsky did propose a legitimate professional contract that could justify the fees discussed at the October 25 meeting. Furthermore, he gave Hills and Marcus a plausible, legitimate explanation for his unwillingness to disclose O'Hara's name at that time,[5] and the record indicates that Sablowsky himself did not then know the name of the second witness. Moreover, the identities of the eyewitnesses should not have been, and thus presumably were not, an especially powerful inducement for Hills and Marcus. Sablowsky knew from O'Hara that Hills and Marcus had already received O'Hara's name in answers to interrogatories. One answer listed O'Hara as among those present during the operation with the designation "CRNA" beside her name; this indicated that O'Hara was one of the few professionals in anaesthesiology among the names listed. On October 25, the three attorneys openly discussed the fact that Hills and Marcus could identify the witnesses by deposing all the individuals whom the interrogatories listed as present in the operating room. And, in any event, Hills and Marcus presumably could have discovered the names by deposing Sablowsky himself, for Sablowsky never presented a basis for claiming an attorney-client relationship with either witness. At most, therefore, as to his knowledge of O'Hara's identity, Sablowsky probably offered Hills and Marcus only the saving of time and trouble.

On the other hand, the testimony of Hills and Marcus, and the notes they each wrote

soon after the October 25 meeting, did provide "clear and convincing evidence" that Sablowsky approached them in order to exchange the name for money. The Hearing Committee found, and the Board accepted the finding, that at the October 25 meeting Sablowsky implied he would not reveal the witness' name "unless plaintiff's counsel hired him as a consultant on the case." The Committee based its finding, to some extent, on the testimony that Hills and Marcus had come away from the October 25 meeting with that impression. Although Hills' and Marcus' mere impressions or feelings could not provide clear and convincing evidence of Sablowsky's intentions, the circumstances under which the meeting took place and record evidence of Sablowsky's statements at the meeting constitute much stronger evidence against Sablowsky. The Hearing Committee emphasized that Hills' and Marcus' impressions that Sablowsky was attempting to sell them evidence at the first meeting "were reasonably based on [Sablowsky's] conduct."[6]

The court unanimously agrees that the evidence concerning the October 25 meeting supports the Hearing Committee's and the Board's conclusions that Sablowsky tried to sell evidence. Hills recorded in notes written on October 25, the day of the meeting, that Sablowsky had "said he wanted a piece of the case for the information, and when I said no, said he would supply it for $25,000." Hills reiterated this report in his testimony to the Hearing Committee. On cross-examination, he stated that "I think at all times it was clear that the name of the witness wouldn't be forthcoming until there was a contract of some sort." Marcus confirmed Hills' report of the meeting. His notes of the meeting

---

5. Sablowsky's reason for not disclosing O'Hara's name has not been rebutted. Although O'Hara had been available on earlier scheduled but cancelled hearing dates, she was unavailable on the actual hearing date. Thus, the Hearing Committee did not have her testimony either to support or to rebut Sablowsky's claim that she had asked him not to reveal her name until she had sent the letter to her employer.

6. The Hearing Committee's report states that it found Sablowsky to have violated the disciplinary rules based solely on the October 25 meeting and part of a telephone conversation of November 3, during which Sablowsky again refused to tell Hills the name of the witness. Thus, the Hearing Committee relied on entirely untainted evidence plus that part of a later telephone conversation during which Sablowsky merely repeated his earlier refusal to produce the name.

record that Sablowsky said "he had given too much information already and that absent some agreement, he was reluctant to provide more." Marcus, as did Hills, left the meeting believing Sablowsky intended to reveal the name only for some consideration.

■ The attempt to sell evidence is "conduct that is prejudicial to the administration of justice" enjoined by DR 1–102(A)(5). This court cannot condone a financial motive for withholding factual evidence by an officer of the court. To permit one attorney to sell information is to permit another to buy it; thus, were the profession to countenance the selling of evidence (other than expert opinion evidence for a fee), it would also endorse an attorney's decision, indeed obligation, to further a client's interests by purchasing harmful factual evidence, in order to assure the seller's silence. Moreover, a market in factual evidence would create new motives to fabricate, alter, or manipulate evidence. The buying and selling of factual evidence would thus needlessly cast a cloud on evidence ultimately presented in court, would threaten rational and fair settlements, and would bring the judicial process and its practitioners into even greater disrepute than they already suffer. *Cf. Commonwealth v. Stump*, 247 Ky. 589, 600–02, 57 S.W.2d 524, 529 (1933). Because a market in factual evidence would hinder the discovery of truth within the justice system and often taint the outcome of disputes, whether litigated or not, the division unanimously concludes that attorneys, as officers of the court, may not participate in such a market either as buyers or as sellers.

### IV.

Finally, we turn to the sanction. This is a case of first impression in the District of Columbia; it does not readily admit of comparison with other cases to ensure equality of treatment. *See* D.C.Bar.R. XI § 7(3); *In re Knox*, 441 A.2d 265, 268 (D.C.1982). On the one hand, Sablowsky's violation was wilful and his conduct was for personal gain. *Cf. In re Stanton*, 470 A.2d 272, 279

(D.C.1983) (adopting recommendation of Board stating that sanction of censure has been "reserved, for the most part, for single cases of neglect") (citing cases), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 821 (1984). On the other hand, Sablowsky committed only a single violation rather than a continuing pattern of unprofessional conduct, and no significant tangible harm was likely to result, or did result, from his actions. *Cf. id.* (noting that disbarment and lengthy suspensions have been imposed for multiple violations, gross negligence, and wilful failure to pursue a client's objectives) (citing cases); *In re Haupt*, 444 A.2d 317 (D.C.1982) (disbarment for extensive pattern of violations).

Sablowsky's misconduct falls into a mid-level class of violations that justify suspension somewhere between sixty days and one year. *See In re Stanton*, 470 A.2d at 280. The Board has recommended a six month suspension. Because in this middle region the court has responded to a great variety of factors in combinations peculiar to each case, the present case cannot directly be compared with others imposing a six month suspension. *See In re Reback*, 513 A.2d 226 (D.C.1986); *In re Whitlock*, 441 A.2d 989 (D.C.1982); *In re Russell*, 424 A.2d 1087 (D.C.1980). Judging Sablowsky's conduct on its own merits, and according due deference to the Board's recommendation, the division unanimously agrees that his actions call for a six month suspension. Accordingly, we order that the respondent, Richard B. Sablowsky, be suspended from the practice of law in the District of Columbia for a period of six months, effective thirty days from the date of this opinion.

*So ordered.*

NEBEKER, Associate Judge, concurring:

I would look to all the evidence and adopt the Board's recommendation. Judge Ferren would take an extreme and unwarranted step in limiting not only the authority of Bar Counsel to investigate allegations of disciplinary rule violations, but also in excluding evidence obtained through that in-

vestigation. This idea of excluding evidence in lawyer discipline cases appears to be born of the rule for constitutional violations by police. I do not agree that Bar Counsel should be so limited in his investigatory responsibilities and that a perceived "violation" of D.C. Bar Rule XI, sec. 4(3)(b) has the gravity of a constitutional violation triggering the exclusionary rule. Section 4(3)(b), *supra,* is more realistically looked at as an administrative rule to ensure that there is fiscal responsibility in staff appointments. The rule as written informs no one that we intended it to confer any rights in an investigated lawyer let alone any right of the magnitude of a constitutional right.

Bar Counsel did what any good lawyer would do when Hills and Marcus went to him with the report of petitioner's efforts to sell evidence. He enlisted their willing aid for further investigation. Implicit in Judge Ferren's willingness to exclude the evidence revealed in that subsequent investigation is that petitioner had a right under the rule that Bar Counsel not undertake covert inquiry. Rather, according to Judge Ferren, Bar Counsel should have "educated" petitioner as to the error of his ways. This is an important policy statement to which the entire court should speak by way of its rules.

The issues presented in this case are the authority of Bar Counsel to enlist private assistance for further investigation and the application of an exclusionary rule if he violates some rule of administration. It seems to me that disciplinary litigation is not the way to resolve these questions. It is fortunate that this division has been unwilling to resolve them in favor of petitioner. My suggestion is that the Board on Professional Responsibility submit to the court proposed rules amendments to make clear Bar Counsel's authority to conduct post-complaint covert investigation and any evidentiary rules deemed just. In this way we may decide these issues without use of the "dog law" theory of Jeremy Bentham for the "blunder" of the constable.

ROGERS, Associate Judge, concurring:

I agree that there was clear and convincing evidence that the respondent violated Disciplinary Rule 1–102(A)(5) based on the events occurring before Bar Counsel became involved, *see* opinion of Judge Ferren, Part IA, and that, assuming error by the Board in its apparently inadvertent reliance on events after Bar Counsel's involvement, there is no need to remand the case for reconsideration by the Board. *Arthur v. District of Columbia Nurses' Examining Board,* 459 A.2d 141, 146 (D.C.1983). *See* evidence set forth in the opinion by Judge Ferren, Part III. I also agree that the Board's recommended sanction of a six-month suspension is appropriate here. *See* opinion of Judge Ferren, Part IV. Because it is unnecessary to this appeal to decide the effect of Bar Counsel's violation of D.C.Bar.R. XI, § 4(3)(b), *see* opinion of Judge Ferren, Part II note 1, I do not reach the issue of the effect of that violation on the admissibility of evidence gathered as a result, or the issue whether Bar Counsel's first obligation upon receiving an informal report of a suspected disciplinary rule violation is educational or investigative.